# United States Court of Appeals
## For the First Circuit

Nos. 20-1368
    20-1412

UNITED STATES OF AMERICA,

Appellee/Cross-Appellant,

v.

RICHARD M. SIMON,

Defendant, Appellant/Cross-Appellee.

Nos. 20-1369
    20-1411

UNITED STATES OF AMERICA,

Appellee/Cross-Appellant,

v.

SUNRISE LEE,

Defendant, Appellant/Cross-Appellee.

Nos. 20-1370
    20-1413

UNITED STATES OF AMERICA,

Appellee/Cross-Appellant,

v.

JOSEPH A. ROWAN,

Defendant, Appellant/Cross-Appellee.

Nos. 20-1382
     20-1409

UNITED STATES OF AMERICA,

Appellee/Cross-Appellant,

v.

JOHN KAPOOR,

Defendant, Appellant/Cross-Appellee.

—————————

Nos. 20-1410
     20-1457

UNITED STATES OF AMERICA,

Appellee/Cross-Appellant,

v.

MICHAEL J. GURRY,

Defendant, Appellant/Cross-Appellee.

—————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

—————————

Before

Howard, Chief Judge,
Selya, Circuit Judge,
and Gelpí,* District Judge.

—————————

William W. Fick, with whom Daniel N. Marx and Fick & Marx LLP
were on brief, for defendant Simon.
Peter Charles Horstmann for defendant Lee.

—————————

* Of the District of Puerto Rico, sitting by designation.

Michael Kendall, with whom Karen Eisenstadt, Alexandra I. Gliga, and White & Case LLP were on brief, for defendant Rowan.

Martin G. Weinberg and Kosta S. Stojilkovic, with whom Martin G. Weinberg Law, P.C., Beth A. Wilkinson, Chanakya A. Sethi, and Wilkinson Walsh LLP were on brief, for defendant Kapoor.

Megan A. Siddall, with whom Tracy A. Miner and Miner Orkand Siddall LLP were on brief, for defendant Gurry.

David M. Lieberman, Attorney, Appellate Section, United States Department of Justice, with whom Nicholas L. McQuaid, Acting Assistant Attorneys General, Criminal Division, Robert A. Zink, Acting Deputy Assistant Attorney General, Nathaniel R. Mendell, Acting United States Attorney, Donald C. Lockhart, Appellate Chief, and Mark T. Quinlivan, Fred Wyshak, K. Nathaniel Yeager, and David G. Lazarus, Assistant United States Attorneys, were on brief, for the United States.

---

August 25, 2021

---

SELYA, **Circuit Judge**.  A noted British ethologist once observed that "[t]he total amount of suffering per year in the natural world is beyond all decent contemplation."  Richard Dawkins, River Out of Eden 131-32 (Basic Books 1995).  Some of this suffering is unavoidable, but some is caused by those who callously place profits over principle.  The facts of this mammoth case, as supportably found by the jury, tell a chilling tale of suffering that did not need to happen.  It involves a group of pharmaceutical executives who chose to shunt medical necessity to one side and shamelessly proceeded to exploit the sickest and most vulnerable among us — all in an effort to fatten the bottom line and pad their own pockets.

The tale told by this case chronicles the pernicious practices employed by a publicly held pharmaceutical firm, Insys Therapeutics, Inc. (Insys), with respect to the marketing and sale of Subsys, a fentanyl-laced medication approved by the United States Food and Drug Administration (FDA) for use in the treatment of breakthrough cancer pain.  When the government got wind of these practices, it launched an investigation.  That investigation produced evidence that led a federal grand jury to indict seven of the company's top executives on charges brought under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C § 1962(d).  Two of the executives eventually entered into plea agreements, but the rest stood their ground.  Following a fifty-

- 4 -

one-day trial, the jury convicted the five remaining defendants as charged (with an exception described below), and the district court (again with an exception described below) declined to set aside the jury verdicts. The court then sentenced the defendants to prison terms of varying lengths, ordered defendant-specific restitution, and directed the forfeiture of certain assets.

On appeal, the defendants — ably represented — raise a gallimaufry of claims. The government cross-appeals, assigning error to the district court's refusal to embrace the whole of the jury verdicts and to its computation of the forfeiture amounts. After careful consideration of an amplitudinous record, we uphold the jury verdicts in full, affirm the defendants' sentences (which are unchallenged), vacate the restitution and forfeiture orders, and remand for further proceedings consistent with this opinion.

**I**

We begin with a snapshot of the relevant facts drawn from the evidence adduced at trial. We then briefly rehearse the travel of the case.

**A**

Insys is a pharmaceutical firm founded by one of the defendants, Dr. John Kapoor. Under the Insys umbrella, Kapoor sought to develop sublingual spray drug-delivery formulations. The firm explored various options, but soon concentrated on

developing a sublingual fentanyl spray. This product came to be called "Subsys."

In early 2012, the FDA approved Subsys for the treatment of patients suffering from "breakthrough cancer pain." The term "breakthrough cancer pain" is a term of art: it refers to brief spikes in pain (typically lasting less than one hour) in patients with cancer who are already dealing with constant and relatively steady pain. All other uses of Subsys were deemed "off-label."

When Subsys went on the market, its FDA-approved label declared that "[t]he initial dose of Subsys to treat episodes of breakthrough cancer pain is always 100 micrograms." Moreover, the label warned that "Subsys contains fentanyl," which is a "Schedule II controlled substance with an abuse liability similar to other opioid analgesics." Relatedly, the label carried a limitation on who could prescribe the drug: due to "the risk for misuse, abuse, addiction and overdose," Subsys could be prescribed "only through a restricted program . . . called 'Risk Evaluation and Mitigation Strategy'" (REMS). This program formed part of the FDA's Transmucosal Immediate Release Fentanyl REMS Access Program, which required patients, prescribers, and pharmacists to sign a form stating that they understood the risks presented by the prescribed drug.

Subsys made its debut in the marketplace in March of 2012 (shortly after FDA approval was secured). At that point in

time, Kapoor was serving as Insys's executive chairman, Michael Babich was serving as its chief executive officer, Shawn Simon was serving as its vice president of sales, and Matthew Napoletano was serving as its vice president of marketing.

Around the time of the Subsys launch, Insys assembled a marketing team. It proceeded to provide its sales force with access to data that ranked physicians "based on their history of prescribing within the opiate market, in particular, the fentanyl market." The ranking system assigned a number between 1 and 10 to each doctor — the higher the number the greater the volume of prescriptions written. Salespeople were instructed to target doctors ranked 5 or above and to give their "highest attention" to those assigned a 10. They were also told to employ a "switch strategy" aimed at persuading prescribers whose patients already had been determined to need a similar fentanyl product to jettison the similar product in favor of Subsys. Although the only approved use for Subsys was for treatment of breakthrough cancer pain, most of the prescribers listed in the database were pain-management specialists, not oncologists.

Notwithstanding Insys's strategic plan, Kapoor was disappointed with initial sales and revenue figures. He told colleagues that it was "the worst f*****g launch in pharmaceutical history he's ever seen." In Kapoor's view, the "main issue" was that the majority of patients who started on Subsys would stay on

the drug only for the first month and would not refill their prescriptions. Napoletano hypothesized that patients were electing not to stick with Subsys because insurance companies were choosing not to cover it. Patients, he suggested, did not want to pay out of pocket to refill Subsys prescriptions.

Kapoor, though, had a different take: he attributed the widespread failure to refill Subsys prescriptions to patients "starting on too low of a dose." Because the Subsys label specified the initial dose as 100 micrograms, Kapoor expressed concern that patients who were used to a higher dose of a competing product would not be satisfied with the pain management offered by Subsys at that initial dosage. Consistent with Kapoor's concerns, sales data (which Insys executives analyzed daily) showed that the lower a patient's starting dose, the higher the "falloff rate."

By the fall of 2012, Insys had begun to overhaul its marketing team. Shawn Simon was cashiered, and Alec Burlakoff (previously a regional manager) replaced him as vice president of sales. Defendant Joseph A. Rowan was promoted into Burlakoff's former role. Defendants Sunrise Lee and Richard M. Simon were installed as regional managers, and defendant Michael J. Gurry became vice president for managed markets.[1]

---

[1] To avoid any confusion between Richard Simon and Shawn Simon, we subsequently refer to Richard Simon — and only Richard Simon — as "Simon."

In addition to these executive-suite changes, Insys revamped its sales and marketing strategy. That fall, it hosted both a national sales meeting and a national sales call to train its sales force on a "new plan of attack." This plan had several components:

- A new "switch program" allowed patients who were transitioning to Subsys from a competing drug to receive vouchers to defray the cost of Subsys for as long as they needed it or until it was covered by their insurance.

- A new "super voucher" program offered a means of providing free product to patients.

- A specially crafted "effective dose" message informed prescribers that, despite the statements on the FDA-approved labelling, 100- or 200-microgram doses were not effective. To complement this "effective dose" messaging, sales representatives were notified "each and every time" a prescriber wrote a Subsys prescription for 100- or 200-micrograms; and they were instructed to report back within 24 hours both as to the reason why the doctor had prescribed the low dose and as to how the doctor planned to titrate the patient to the "effective dose."

- A revised compensation structure was put in place. This structure rewarded sales representatives for pushing doctors to prescribe higher doses of Subsys. Under it, larger prescribed doses yielded salespeople larger bonuses both because bonus percentages were higher for higher doses and because higher doses were more costly.

The icing on the cake was Insys's inauguration of a speaker program in August of 2012. The ostensible "objective of the program" was to provide "peer-to-peer education." To that end, Insys would invite physicians whom it envisioned as potential Subsys prescribers and the speaker (a fellow health-care provider) would "present the information [about the drug] to them." These presentations would take place through "online web hosting[s]" or at "dinner meetings." Each sales region was to host a roughly equal number of programs.

In its original incarnation, the speaker program never got off the ground. Instead, Kapoor transmogrified it. About a month after Napoletano announced the inauguration of the program, Kapoor "put on hold all speaker programs effective immediately." This directive emanated from Kapoor's disagreement with Napoletano about what the objective of the program ought to be: as Kapoor saw it, the speaker program "was designed for the speakers," not

for the physicians who comprised the audience. Kapoor "wanted every speaker to write" Subsys prescriptions.

To accomplish this objective, Kapoor asked Napoletano for a list of the doctors who served as speakers, along with data as to "how many of them were writing [Subsys]" and data as to "what percentage of the prescriptions came from them." Napoletano balked, responding that "it's the attendees that you measure" — not the speakers. Kapoor "was not in agreement with that" and continued to insist upon a restructuring of the program.

In September, Kapoor, Burlakoff, Babich, and Napoletano met to discuss the direction of the speaker program. Consistent with Kapoor's vision, Burlakoff argued against the original peer-to-peer education model. When Napoletano pointed out that "in accordance with pharma code" each event had to have "a minimum of two to four people" attend, Burlakoff replied that he "d[idn't] care if there are any attendees" and that "he expect[ed] every speaker to write" prescriptions. He said that the speaker program should be "about the speaker and getting return from the speaker." Although the meeting "was very contentious," Kapoor was satisfied that his message had been received and proceeded to lift his "hold" on the speaker program.

Burlakoff then emailed the sales force stating that speaker programs are "the number one opportunity to grow [their] business." He predicted that "[t]he hungry, motivated sales

representatives will be facilitating as many speaker programs as humanly possible."  He also suggested that a successful speaker program would require salespersons to seek out speakers who are "expert[s] with the utilization of Subsys in [their] clinical practice" and who "have at least 20 patients on Subsys."

Even with this sharp change in direction, Insys's top brass disagreed as to how to measure the program's success.  In October, Kapoor, Napoletano, Babich, and Burlakoff met regarding that issue.  Napoletano wanted to "track [the attendees] moving forward to see if the presentation had any impact and if they adopted the product in their practice."  Burlakoff disagreed and reiterated that "the metric to track is the speaker."  The meeting concluded with the issue still up in the air.

At a subsequent meeting, Kapoor resolved the issue.  He stated that he "wanted to make sure every speaker wrote" Subsys prescriptions and "wanted a positive ROI" — a shorthand reference to return on investment.  The ROI, as Kapoor measured it, would be the ratio between net revenue and the amount paid for speaker services.  After a heated exchange, Napoletano capitulated and agreed to begin preparing reports tracking speakers and their corresponding ROIs.  These reports allowed Kapoor to "see how successful [the] speakers were and how much product they were writing, based on how much money [Insys] had given them so far."  Once this data became available, any speaker who "did not generate

at least two times in revenue what was being paid to them" was "flagged" for a "temporary hold on programming." Refined to bare essence, the flagged speakers "wouldn't get programs" and, thus, would not receive honorariums.

This new protocol transformed the speaker programs from pedagogical exercises into funding mechanisms for a pay-for-play fandango. It is, therefore, unsurprising that with the new protocol in place, Burlakoff sought to identify "whales." He coined the term "whales" to refer to physicians who "ha[d] agreed in a very clear and concise manner that they [were] up for the deal, which [meant that] they [would] be compensated based on the number of prescriptions of Subsys they wr[ote]." A corollary to that deal was that "the more they wr[ote] and the more they increase[d] the dose, the more they'[d] get paid to speak." At Burlakoff's urging, regional sales managers were to have a "candid conversation" with each potential whale and make clear that if the physician was going to receive payments from Insys, he was "going to write a significant amount of Subsys prescriptions to new patients as well as increase the doses of current patients." Burlakoff told sales managers to view speakers as their "business partner[s]."

Burlakoff's whale hunt was fruitful: he identified many whales, including Drs. Mahmood Ahmad, Gavin Awerbuch, Steven Chun, Patrick Couch, Paul Madison, Judson Somerville, and Xiulu Ruan.

These prescribers were frequently mentioned on the daily 8:30 a.m. management calls, in which Kapoor, Babich, Napoletano, Burlakoff, and Gurry regularly participated. All of the whales committed to prescribing large quantities of Subsys. And if a whale failed to meet prescription expectations, an Insys representative would put pressure on him to get him back on track.

Without exception, the prescription numbers of these physicians increased when they joined the speaker program. In an email, Burlakoff described the doctors as "clueless" because they "prescribe strictly based on their relationship with the sales manager." As a result of that relationship and the pressure that sales representatives exerted, practitioners designated as "[s]peakers" generated approximately $4,200,000 in net revenue (60 percent of Insys's total net revenue) after receiving more than $550,000 in speakers' fees. Pleased with the success of the reconstituted speaker program, Kapoor raised the speaker budget in subsequent years.

Insys allocated speaker programs primarily to whales and other prolific Subsys prescribers. These practitioners were paid between $1,000 and $3,000 per event, depending on the particular practitioner's "résumé or . . . influence." Speakers' payments were routinely sent by mail. Multiple speaker events featured the same practitioner. Insys initially capped annual speaking fees at $100,000 per practitioner but later raised the ceiling to $125,000.

At a meeting in January of 2014, Babich, Burlakoff, and Richard Simon compiled a list of "doctors that had the highest potential to write." Burlakoff then "mobilized the sales force to go out and make sure that these 19 or 20 doctors reached their [fees] cap."

Despite the largess shown to speakers, the speaking events themselves had little to no attendance. Often, only the speaker, a friend or family member, and the sales representative were on hand. Even when more people were in attendance, the speaker programs were mostly "social outings" or "just a reason to gather people and have dinner and pay [the doctor]." Although sales representatives were required to submit sign-in forms and attendee evaluation forms to a third-party compliance firm (Sci Medica), they frequently submitted inaccurate documentation, including sign-in sheets with names and signatures of people who were not present, to give the speaking programs an aura of legitimacy. And when Kapoor replaced Sci Medica with an in-house compliance officer, the apocryphal documentation continued to flow.

While the revamped speakers' program drove up the volume of Subsys prescriptions, insurance coverage remained a problem. Medicare, Medicaid, and private insurance companies covered the cost of Subsys prescriptions only if a practitioner obtained prior authorization to prescribe the drug. And because of the FDA label,

coverage was limited to patients with a current cancer diagnosis who both suffered from breakthrough cancer pain and already had tried other opioid medication.

Nor did the coverage limitations stop there. As a condition precedent to coverage, insurers required that a patient had tried a generic fentanyl product that had either failed to ameliorate the breakthrough cancer pain or proved difficult to ingest. To seek prior authorization, a practitioner typically submitted patient and diagnosis information to the insurer, and the insurer relied upon the accuracy of the submitted information in its decisionmaking. When Insys launched Subsys, it processed prior authorization requests through a third party and achieved only a 30-35 percent success rate for prior authorization approvals.

To enhance the approval rate, Gurry suggested bringing the approval process in-house. With Kapoor's blessing, Gurry hired Elizabeth Gurrieri in October of 2012 to found the Insys Reimbursement Center (IRC), which operated out of Insys headquarters. Insys created an opt-in form through which Subsys prescribers could authorize the IRC to contact insurers and request prior authorizations. The form listed patient information that insurers typically would request during the prior authorization process, such as whether the patient had tried certain medications. Particular items from the list could be checked off as applying to

a specific case.  This streamlined the process:  a prescriber would sign and fax an opt-in form to the IRC; the IRC would call the insurer; and if the insurer needed additional information, the IRC would reach out to the sales representative who would then follow up with the prescriber.  Insys encouraged physicians to use the IRC, knowing that if the prior authorization was approved, "[t]he sales rep would get paid, Insys would get paid, and the script would get paid."  A pilot program achieved an approval rate of 65-70 percent.  As a result, Insys quickly transitioned the IRC out of its pilot phase and expanded it.  Gurrieri was promoted to manager of reimbursement services in March of 2013.

The IRC proved to be a rousing success.  It owed much of its success to the sales representatives.  They interacted with the physicians and collected documentation requested by insurers during the prior-authorization process.  A sales representative would often spend at least one day per week in a physician's office, reviewing patient files, assisting with authorizations, and completing the opt-in forms.

Another factor in the IRC's success was the hiring of "area business liaison[s]."  These individuals were assigned to the physicians who prescribed Subsys in substantial volume.  Each area business liaison worked in a physician's office processing authorizations, but was paid by Insys, thereby reducing the physician's overhead.

The third, and perhaps most impactful, factor in the IRC's success was Insys's decision to begin collecting data on each coverage decision. The IRC identified diagnoses and conditions that historically had prompted particular insurers to approve Subsys prescriptions. It proceeded to list these diagnoses and conditions on the opt-in form, and sales representatives encouraged physicians to employ them when seeking Subsys authorizations. For example, Gurrieri noted success using "the terminology 'history of cancer,' which means that they didn't have cancer at the time but they had a history of cancer." Once salespeople heard that use of that phrase could help obtain insurance approval, the IRC, "all of a sudden, saw more opt-ins having 'history of cancer' on them, which [led] to better approval ratings."

Management regularly discussed the IRC on the daily 8:30 a.m. calls. All updates about the IRC were communicated by Gurry during those calls. Although Insys had made great strides in upping its approval rate, Kapoor put constant pressure on the IRC to achieve a rate of 90 percent or higher. Striving to attain this benchmark, the IRC started to offer training sessions to sales representatives on "how to get the drug approved." Similarly, Gurry started to advise sales representatives about what diagnoses and conditions should be checked on the opt-in forms. He famously directed IRC employees "to ride the gray line," that is, to "work

- 18 -

around the insurance companies" and "find ways around their questions." Following that direction, the IRC developed strategies to mislead insurers into granting prior authorizations for the use of Subsys. Some of these strategies included misleading the insurer into believing that the caller was calling from the physician's office rather than from the IRC; representing that a patient had cancer even if the available information reflected only a history of cancer; giving the ICD-9 diagnosis code as "338" to obscure the fact that the diagnosis was chronic pain (which uses code 338.29 or 338.4) and not cancer pain or neoplasm-related pain (which uses code 338.3); listing tried-and-failed medications that the patient had never used; and falsely stating that patients had dysphagia (difficulty swallowing).

Insys expected insurance companies to ask whether a physician had prescribed Subsys to treat "breakthrough cancer pain." Gurrieri instructed IRC staff to respond with "the spiel," which was pat phrasing designed to obfuscate the purpose of the prescription. The essence of the spiel was that "[t]he physician is aware that the medication is intended for the management of breakthrough pain in cancer patients, and the physician is treating the breakthrough pain." Phrased in this way, the expectation was that "the person on the other end of the phone would be misled to think the patient had cancer and approve the prior authorization."

The record makes manifest that the IRC, in practice, was more interested in transmitting information that would prompt favorable coverage determinations than it was in transmitting accurate information. Through the IRC, the insurers were fed a steady diet of deceptions, evasions, and half-truths.

Just as sales representatives were incentivized to push physicians to prescribe higher doses of Subsys, IRC staffers were incentivized to obtain insurance approvals. Goals known as "gates" were set weekly. If the gate was opened, the staff member (usually paid a low hourly wage) would receive a bonus.

The cocktail that Insys had mixed — including its revised marketing and sales strategies, its use of speaker programs as vehicles for bribes to physicians, its use of business liaisons, and its no-holds-barred tactics within the IRC — proved to be lucrative. Insys was able to go public only a year after introducing Subsys to the market. Within two years after the initial public offering, the company reached a market cap of over $3,000,000,000. And by the end of 2015, Insys's stock price had nearly quadrupled. Throughout, the defendants received substantial salaries, bonuses, and stock options.

But Insys's meteoric rise appeared too good to be true, and the company attracted unwanted attention. When federal authorities began probing the details of how Insys was marketing Subsys, the defendants' scheme began to unravel.

**B**

In the wake of the federal investigation, a federal grand jury sitting in the District of Massachusetts charged Kapoor, Lee, Simon, Gurry, and Rowan with conspiracy to distribute Subsys through a pattern of racketeering activity.[2] See id. The conspiracy was effected, the indictment said, through acts of mail fraud, see id. § 1341; honest-services mail fraud, see id. §§ 1341, 1346; wire fraud, see id. § 1343; honest-services wire fraud, see id. §§ 1343, 1346; and Controlled Substances Act (CSA) violations, see 21 U.S.C. § 841(a)(1). Following lengthy pretrial maneuvering, not relevant here, a fifty-one-day trial ensued.

The jury returned guilty verdicts against all of the defendants. In connection with those verdicts, the jury made a series of special findings that all the defendants were guilty of committing predicate acts of mail-fraud and wire-fraud, and that all the defendants (except Gurry) were guilty of agreeing to distribute a controlled substance and to commit honest-services mail fraud and honest-services wire fraud.

The defendants moved for judgments of acquittal and/or new trials. See Fed. R. Crim. P. 29(a), 33(a). The district court granted in part the joint motion for judgments of acquittal filed by Kapoor, Lee, Simon, and Rowan, vacating as to them the adverse

---

[2] Babich and Burlakoff were also named as defendants. Both of them entered guilty pleas before trial.

- 21 -

findings with respect to the CSA and honest-services predicates. See United States v. Gurry, 427 F. Supp. 3d 166, 222 (D. Mass. 2019). But with respect to all five defendants, the court rejected their challenges to the mail- and wire-fraud predicates, rejected their efforts to secure judgments of acquittal, and declined to order a new trial. See id. The court sentenced the defendants to terms of immurement of varying lengths and entered a series of restitution and forfeiture orders.[3] See United States v. Babich, No. 16-CR-10343, 2020 WL 1235536, at *10 (D. Mass. Mar. 13, 2020). All of the defendants appealed, and the government cross-appealed.

## II

In this venue, we are faced with a kaleidoscopic array of claims. Kapoor, Lee, Simon, and Rowan contend that the evidence was insufficient to convict on the various mail- and wire-fraud predicates, assigning error to the district court's denial of their joint motion for judgment of acquittal. Relatedly, all defendants claim error in the admission of patient-harm testimony and

_____

[3] The court sentenced Kapoor to a sixty-six-month term of immurement, ordered restitution of $59,755,362.45, and directed forfeiture of $1,914,771.20. As to Lee, the court imposed a prison sentence of a year and a day, ordered restitution of $5,000,000, and directed forfeiture of $1,170,274. As to Simon, the court imposed a thirty-three-month term of immurement, ordered restitution of $5,000,000, and directed forfeiture of $2,338,078.72. Gurry's sentence was identical to Simon's, except that he was ordered to forfeit $3,390,472.89. Finally, the court sentenced Rowan to serve a twenty-seven-month prison term, ordered restitution of $5,000,000, and directed forfeiture of $2,078,217.66.

prejudicial spillover arising out of the government's efforts to prove the CSA and honest-services predicates through that testimony.

Some defendants raise individual claims as well. Lee challenges the district court's order denying her pretrial motion for severance, certain of the district court's evidentiary rulings, and one of the district court's jury instructions. Rowan claims that the government unlawfully withheld exculpatory material, and that the district court erred in denying his mid-trial motion to compel production of that material. The defendants, jointly and severally, offer a plethora of reasons as to why they — or some of them — ought to be granted new trials, including claims relating to allegedly conflicted counsel, weight of the evidence, and prosecutorial misconduct during closing arguments.[4] And although the defendants do not challenge their

---

[4] At various points, some of the defendants purport to incorporate by reference arguments made by other defendants. See Fed. R. App. P. 28(i). For example, a footnote in Rowan's brief purports to "adopt[] and incorporate[] the facts and arguments in the briefs of co-defendants Dr. John Kapoor, Richard Simon, Michael Gurry, and Sunrise Lee, whether or not this brief explicitly mentions them." Lee's and Gurry's briefs each contains similar statements.

The rule in this circuit is that "[a]doption by reference . . . cannot occur in a vacuum; to be meaningful, the arguments adopted must be readily transferrable from the proponent's case to the adopter's case." United States v. David, 940 F.2d 722, 737 (1st Cir. 1991). Given this rule, the shorthand adoption by reference attempted by these defendants is partially an empty gesture. And to the extent that the incorporated arguments pass through this screen, they fail on the merits (except

prison sentences, they do contest the district court's ancillary orders awarding restitution and forfeiture. The government cross-appeals, assigning error to the district court's order vacating the jury's findings adverse to Kapoor, Lee, Simon, and Rowan on the CSA and honest-services predicates. It also appeals the district court's calculation of forfeiture amounts with respect to Lee, Simon, Gurry, and Rowan.

We start our journey with the parties' competing claims concerning the sufficiency of the evidence with respect to the CSA and honest-services predicates. From there, we wend our way through the remaining sufficiency-of-the-evidence claims, the admissibility of the patient-harm testimony, questions pertaining to evidentiary spillover, and a myriad of other claims of trial error. Our journey ends with an appraisal of the parties' opposing views regarding issues related to restitution and forfeiture.

**III**

Under RICO, it is a crime "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce," to conspire "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." See 18 U.S.C. § 1962(c), (d). A pattern of

with respect to certain incorporated arguments, identified in Parts XIV and XV, infra, regarding restitution and forfeiture).

- 24 -

racketeering activity requires at least two predicate racketeering acts within ten years of each other. See id. § 1961(5). A defendant need not have "agree[d] to commit or facilitate each and every part of the substantive offense" in order to be found guilty. Salinas v. United States, 522 U.S. 52, 63 (1997). Nor need such a defendant be capable of committing the substantive offense. See id. Instead, "[a]ll the government need show is that the defendant agreed to facilitate a scheme in which a conspirator would commit at least two predicate acts, if the substantive crime [had] occurred." United States v. Rodríguez-Torres, 939 F.3d 16, 29 (1st Cir. 2019); see Salinas, 522 U.S. at 65 ("A [RICO] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.").

In this case, the critical questions involve whether — as to each defendant — the record sufficiently supports the jury's verdict that he or she, directly or through another conspirator, committed the charged offenses. While the jury answered these questions in the affirmative (except as to Gurry, who was found guilty only with respect to the mail- and wire-fraud predicates), the district court found the government's proof of the CSA and honest-services predicates wanting. The court ruled that, although "it would not have been unreasonable for the jury to infer

that the nefarious tacit understanding the Government describes existed," it "would have been equally reasonable for the jury to infer from the same evidence that no such tacit understanding existed." Gurry, 427 F. Supp. 3d at 186. Because the proof "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," the court vacated the jury findings regarding the CSA and honest-services predicates vis-à-vis Kapoor, Lee, Simon, and Rowan. Id. (quoting United States v. Burgos, 703 F.3d 1, 10 (1st Cir. 2012)).

The government appeals from this ruling. Our task is familiar. We afford de novo review to the district court's rulings on the defendants' joint motion for judgment of acquittal. See United States v. Kilmartin, 944 F.3d 315, 325 (1st Cir. 2019); United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995). "Where, as here, the defendant[s] challenge[] the sufficiency of the evidence, all of the proof 'must be perused from the government's perspective.'" Kilmartin, 944 F.3d at 325 (quoting United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001)). This lens demands that "we scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt." Olbres, 61 F.3d at 970 (quoting United States v. Taylor, 54 F.3d 967, 974 (1st Cir. 1995)).

In conducting this tamisage, "we must honor the jury's evaluative choice among plausible, albeit competing, inferences." United States v. Rodríguez-Vélez, 597 F.3d 32, 40 (1st Cir. 2010). When all is said and done, "[t]he court need not be convinced that the verdict is correct; it need only be satisfied that the verdict is supported by the record." Kilmartin, 944 F.3d at 325. Consequently, a "verdict must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a reasonable doubt." Rodríguez-Vélez, 597 F.3d at 39 (emphasis in original).

Our next chore is to elaborate the elements of the CSA predicates. The CSA makes it a crime "for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance." 21 U.S.C. § 841(a)(1). Even so, licensed health-care practitioners (typically, physicians) registered under the CSA are authorized to dispense controlled substances. See id. § 822(b). This authorization, though, is not absolute. Such practitioners face criminal liability "when their activities fall outside the usual course of professional practice." United States v. Moore, 423 U.S. 122, 124 (1975); see United States v. Limberopoulos, 26 F.3d 245, 249 (1st Cir. 1994) ("[T]he statute applies to a pharmacist's (or physician's) drug-dispensing activities so long as they fall outside the usual course of

professional practice."). Because a RICO conspiracy conviction requires proof that defendants "specifically intended that some conspirator commit each element of" the predicate racketeering acts, Ocasio v. United States, 136 S. Ct. 1423, 1432 (2016) (emphasis in original), the government had to prove that the defendants specifically intended that a licensed practitioner would prescribe Subsys "with no legitimate medical purpose," United States v. Volkman, 797 F.3d 377, 391 (6th Cir. 2015); see United States v. Feingold, 454 F.3d 1001, 1008 (9th Cir. 2006).

Against this backdrop, we canvass the proof as to Kapoor, Lee, Simon, and Rowan.

**A**

Through his motion for judgment of acquittal, Kapoor challenged, inter alia, the jury's finding that he was guilty of conspiracy to commit racketeering activities through a pattern of racketeering acts that included the CSA and honest-services predicates. As we have said, the district court set aside the jury's findings with respect to those predicates. The question is one of evidentiary sufficiency.

The record is replete with support for the proposition that Kapoor intended physicians to write medically illegitimate prescriptions. Kapoor sought out pill mill doctors (that is, doctors who were notorious for their readiness to prescribe drugs regardless of medical necessity). See, e.g., United States v.

Iriele, 977 F.3d 1155, 1161 (11th Cir. 2020) (describing as "pill mill" a clinic where people "could get prescriptions for their controlled substances of choice with few, if any, questions asked"). For instance, Burlakoff testified that, to increase sales, Kapoor wanted him to do "[w]hatever it took with whomever [they] called on, including pill mill doctors."

Perhaps the best illustration of Kapoor's intent is found in the evidence concerning his attitude toward Dr. Madison. Kapoor encouraged dealings with Dr. Madison despite having reviewed an email in which a sales representative wrote that "Dr. Madison runs a very shady pill mill and only accepts cash. . . . He basically just shows up to sign his name on the prescription pad, if he shows up at all." Kapoor also knew that another sales representative had observed a "shady setup" in Dr. Madison's office with "many patients . . . going in and out of there . . . just seeking medication." As one expert witness put it, this prescribing behavior was inconsistent with a doctor's duty to carry out "those things that are necessary to reasonably diagnose the problem," such as "history taking, physical examination, and the obtaining and evaluation of diagnostic studies."

Although on unmistakable notice of the kind of operation that Dr. Madison appeared to be running, Kapoor pursued him. Babich testified that Kapoor "wanted [Dr. Madison] to write the

drug" and awarded him speaker programs (and, thus, kickbacks) "as much as once a week." This was consistent both with Babich's description of Kapoor's avowed "philosophy" and with other evidence reflecting Kapoor's appetite for whales. The jury reasonably could have found that Kapoor's decision to continue courting and compensating Dr. Madison, notwithstanding his knowledge that the doctor was running a notorious pill mill, was proof of at least a tacit understanding of Kapoor's culpable role in the distribution scheme. See United States v. King, 898 F.3d 797, 809 (8th Cir. 2018).

Kapoor complains that this is a bridge too far. He laments that he received hundreds of emails a day, that he was busy with other business pursuits and charitable endeavors, and that Dr. Madison is only one of 13 doctors discussed in the four-page email. It follows, Kapoor suggests, that a reasonable jury could not infer that he read the sales representative's description of Dr. Madison.

This suggestion is little more than whistling past the graveyard. It conveniently overlooks that the jury heard evidence that Kapoor demanded information on "every [Subsys] script that was written" and "every doctor that wrote it." He demanded spreadsheets to parse doctor-level data and sought to identify "whales" — doctors who understood that, in exchange for speaker-

program payments, they would prescribe "a significant amount of Subsys prescriptions."

What is more, Babich testified that Kapoor expressed great interest in these kinds of sales reports. Kapoor "want[ed] every single rep every Friday to e-mail [Babich] a list of all their top physicians and what happened with those top physicians that week." An assistant "print[ed] these out" and put "them on [Kapoor's] desk for Monday morning, so he c[ould] review" them. Given that level of attention to detail vis-à-vis prescribers, the inference that Kapoor read the email about Dr. Madison seems compelling.

Last — but surely not least — Babich confirmed that he gave the four-page email directly to Kapoor. He also testified that — several months after he had forwarded that email about Dr. Madison to Kapoor — the same sales representative again reiterated that Dr. Madison operated a pill mill and added that Dr. Madison faced possible legal action. Babich described this matter as "a serious issue" and testified that he personally reviewed this information with Kapoor. Kapoor responded that Dr. Madison "still has a medical license. I don't want him taken off the call list" for speaker programs.

We need not tarry. The evidence, taken in the light most hospitable to the verdict, plainly supports the inference that Kapoor knew of Dr. Madison's illegitimate prescribing habits

yet took steps to ensure that he would continue prescribing Subsys. Indeed, the evidence warrants an inference that Kapoor sought to recruit Dr. Madison as a speaker (that is, as a kickback recipient) precisely because of these habits. Such an inference is consistent with other evidence that pill mill doctors were prized by Kapoor: he tracked physicians' prescription patterns, gave favorable treatment to the doctors who prescribed Subsys most profligately, and — according to Burlakoff — did "whatever it took" to increase Subsys sales. As Burlakoff put it, Kapoor's message to the sales force was that "pill mills for [Insys] meant dollar signs."

The evidence also showed that Kapoor led Insys's effort to influence physicians' prescription decisions through "effective dose" messaging. The FDA-approved label stated that "[t]he initial dose of Subsys to treat episodes of breakthrough cancer pain is always 100 micrograms." Doctors were supposed to "look at one patient at a time" and "titrate one patient at a time" to the dose of the drug that achieves "the desired effect." Noting that patients on higher doses were more likely to refill their Subsys prescriptions, Kapoor sought to ride roughshod over this regime and "move patients to higher doses." His mantra was to "push the dose." To that end, he incorporated into the speaker program kickbacks for dosage increases — the greater the increase, the greater the payout. Predictably, Kapoor's campaign to increase dosages resulted in the sales force negotiating dosage agreements

with doctors.  And Insys closely monitored these agreements:  for example, when Dr. Somerville's dosage numbers appeared to be low, a sales representative was instructed to "[d]rill into [the medical assistant's] head that every refill has to be 180 to 240 [micrograms]" because "Dr. Somerville agreed to do this."

To sum up, the evidence plainly supports a finding that Kapoor intended practitioners to prescribe Subsys as much as possible, even when there was no medical necessity for the drug or the dosage prescribed.  His "effective dose" campaign was designed to dissuade doctors from prescribing medically appropriate lower dosages and to accelerate dose titration.  A reasonable jury could infer that, by taking these actions, Kapoor pushed physicians — in Burlakoff's words — to "initiate a new habit" that would transform patients into repeat customers, quite apart from medical necessity.  See United States v. Clough, 978 F.3d 810, 820-21 (1st Cir. 2020) (concluding that giving "opioid-dependent patients high dosages of this highly-addictive fentanyl drug, even when patients had no problems with their existing regimen" supported reasonable inference that defendant's "behavior was not reminiscent of a physician assistant prescribing based on need, but rather [that] of a drug pusher").  And having thrown medical necessity to the wind, Kapoor's "push the dose" message effectively directed Insys salespersons, who were not health-care professionals, to enforce mandatory ranges of dosages.  Following Kapoor's lead, they shaped

doctors' prescription decisions without regard to any individual patient information by getting the doctors to commit to meeting prescription-quantity numbers on a weekly basis. Jurors are allowed to use common sense and — surveying this unattractive tableau — a reasonable jury could have inferred that Kapoor, in "push[ing] the dose," intended doctors to increase doses of Subsys regardless of who the patient was or what the patient's medical needs might be. See United States v. Guzman, 571 F. App'x 356, 363 (6th Cir. 2014) ("[T]he jury could reasonably infer the requisite agreement to distribute controlled substances, as well as knowledge and participation" from "evidence showing that [defendants] tried to modify the prescribing practices of another nurse practitioner," including by directing a "nurse to prescribe short-acting rather than long-acting medications and to prescribe prednisone for all customers.").

So, too, a reasonable jury could conclude that when drug wholesalers reported suspicious Subsys ordering patterns to the federal Drug Enforcement Administration (DEA), Kapoor sought to tamp down any suspicions so that Insys could continue its modus operandi while concealing it from outside scrutiny. Wholesalers serve as middlemen between pharmaceutical manufacturers and pharmacies and they impose quantity limits on the amount of controlled substances that a pharmacy can receive each month. When wholesalers notice suspicious ordering patterns, they are

obligated to notify the DEA. During the relevant time frame, several pharmacies that served Insys speakers overshot their monthly quantity limits. As a result, drug wholesalers froze Subsys shipments to those pharmacies.

Insys executives knew that the reason for the freeze was that wholesalers' software algorithms to monitor order patterns had flagged Subsys orders as "potentially suspicious." In an email to Kapoor, Christopher Homrich, an Insys executive, told him that it was "very likely" that the DEA software would flag future orders from those pharmacies as "suspicious" due to the "material" increase in projected Subsys sales. Such freezes would be inimical to Insys's strategic aim of getting doctors to prescribe Subsys in heavy doses and without regard to medical necessity. Because "Kapoor wanted to keep doing business" with the physicians (particularly the whales) associated with the targeted pharmacies, he demanded that Insys executives "find an alternative to make sure one of our top customers has the product."

To accomplish this end run around the DEA and to avoid the imminent freezes, Kapoor decided to explore a direct-ship option. Such an option would have Insys ship Subsys straight to the pharmacy associated with the prescribing doctor. Insys's distribution manager (Dion Reimer) advised against this setup "at least a dozen times." Given that Subsys was a controlled substance, "[t]rying to circumvent any of the systems that are out

there could raise red flags." Kapoor disregarded Reimer's protests and authorized sales representatives to negotiate supply commitments and direct-ship agreements with individual doctors. At his direction, Insys proceeded down this crooked path.[5]

Kapoor insists that the direct-ship agreements were made only to "maximize sales of Subsys" and that he was "not trying to evade DEA rules." But something that prowls like a tiger and growls like a tiger usually is a tiger — and Reimer's assessment of the direct-ship option as a means of circumventing DEA guidelines seems spot-on.

In arguing to the contrary, Kapoor points to Babich's testimony recounting how Insys retained "outside attorneys who have expertise with the DEA rules" to ensure the direct-ship arrangements were done "the right way." Babich also testified, though, that Insys "did not tell the lawyers who drafted the agreement[s] that [Insys was] providing kickbacks to the physicians" associated with these pharmacies. According to Babich, that omission was deliberate: the company feared that the bribes contravened federal anti-kickback law. Under certain circumstances, a party's retention of counsel may (as Kapoor

_____

[5] Unscrupulous practitioners apparently welcomed the direct-ship option. In one of the weekly sales representative reports, Kapoor was informed that Dr. Ahmad had committed to write "more scripts than [Insys] can handle . . . once the pharmacy issue is resolved." Other practitioners, including Drs. Couch, Ruan, and Awerbuch, also benefited from direct-ship agreements.

suggests) ground an inference of benevolent motive.  See United States v. Powers, 702 F.3d 1, 9 (1st Cir. 2012).  But viewing what happened here in context, a jury instead could reasonably infer that direct-ship agreements were evidence of Kapoor's efforts to have doctors continue to prescribe Subsys illegitimately.  See id. (explaining that advice-of-counsel defense "is not available to one who omits to disclose material information to advisors" (quoting Janeiro v. Urological Surgery Prof. Ass'n, 457 F.3d 130, 140 (1st Cir. 2006))).

Taking the evidence in the light most favorable to the verdict, a jury reasonably could conclude — as this jury did — that Kapoor relentlessly pursued pill mill doctors, pressured health-care practitioners to increase dosages regardless of medical need (through financial incentives and upfront prescription commitments), knew of and encouraged certain physicians' illegitimate prescribing habits, and — facing regulatory scrutiny for the burgeoning sales generated through these tactics — tried to hide the true state of affairs by cutting out the middleman.  Cf. Volkman, 797 F.3d at 391 (holding that evidence that defendants "were aware of the reality that the prescriptions from their clinic had no legitimate medical purpose" and that "[i]nstead of rectifying the . . . issues with [the] prescriptions, [defendants] exacerbated the problem by . . . cutting out the middleman" sufficed "for a jury to find

that [defendants] executed a plan to unlawfully distribute controlled substances with no legitimate medical purpose"). Consequently, we are satisfied that the adverse finding against Kapoor as to the CSA predicates was supported by the record and, therefore, should have been allowed to stand.

This holding also dictates that we reinstate the jury's verdict against Kapoor as to the honest-services predicates. Federal law prohibits a "scheme or artifice to defraud," 18 U.S.C. §§ 1341, 1343, including "a scheme or artifice to deprive another of the intangible right of honest services," id. § 1346. A person contravenes this provision if, "in violation of a fiduciary duty, [he] participate[s] in bribery or kickback schemes." Skilling v. United States, 561 U.S. 358, 407 (2010). Kapoor disputes the "fiduciary duty" element and contends that the government failed to prove that he specifically intended health-care professionals to write medically illegitimate Subsys prescriptions.

As the district court noted, the "overlap" between the CSA and honest-services predicates is striking. Gurry, 427 F. Supp. 3d at 187-88. Just as the jury instructions for the CSA predicates required proof beyond a reasonable doubt that a particular defendant agreed that a health-care practitioner would prescribe Subsys outside the usual course of medical practice, the honest-services predicates required evidence that "the Defendant agreed and specifically intended that health-care practitioners

would breach their fiduciary duty to their patients by prescribing Subsys or a particular dose of Subsys outside the usual course of professional practice and not for a legitimate purpose." Accordingly, the evidence supporting the intent element of the CSA predicates was "coextensive" with the evidence supporting the fiduciary duty element of the honest-services predicates. Id. at 188.

That is game, set, and match. Because we already have concluded that the evidence supports the jury's finding with respect to Kapoor's guilt regarding the CSA predicates, we must perforce conclude that the evidence supports the findings with respect to Kapoor's guilt regarding the honest-services predicates. It follows that we must reverse the district court's partial grant of the Rule 29(c) motion in favor of Kapoor and reinstate the jury's findings as to him insofar as they pertain to both the CSA and honest-services predicates.

**B**

The district court set aside the jury's finding that Lee was guilty of conspiracy to commit racketeering activities through a pattern of racketeering acts that included the CSA and honest-services predicates. The jury heard evidence, though, that Lee supervised the sales representative who reported that Dr. Madison had a "shady setup" and that patients at Dr. Madison's office "were just seeking medication." When the sales representative spoke to

Lee about her concerns with Dr. Madison's potential law-enforcement issues, Lee replied that "[i]t was okay." Like Kapoor, she appeared unfazed by Dr. Madison's potential criminal liability and "ensured that Dr. Madison understood that he would speak . . . as much as [Insys] can utilize him" — which meant, of course, that Dr. Madison would continue to receive kickbacks. The only condition was that "he would prescribe a significant amount of Subsys, more and more as time went on, and increas[e] the dose." This condition had nothing to do with medical necessity.

Lee's hot pursuit of Dr. Madison supports the conclusion that getting doctors to write illegitimate prescriptions was not merely an unforeseeable risk of her work for Insys but, rather, an integral part of the business model that she assiduously followed while doing that work. As Babich explained, Dr. Madison was made a speaker notwithstanding that his clinic was a pill mill "[b]ecause he was the biggest writer of the type of product in the Chicago land area, and getting that revenue was very important to [Insys] as a company." A jury could reasonably infer that Insys knowingly counted on revenue from illegitimate prescriptions and that Lee (as a regional sales manager who benefitted handsomely from greater sales) intended to keep that revenue stream flowing even if it meant prescribing Subsys to patients who did not legitimately need it.

Other evidence corroborated the conclusion that Lee intended prescribing doctors to expand the company's customer base to people who did not qualify medically to use Subsys. The regional managers were instructed by Simon "to get a specific number of scripts per week that is mutually agreed to and an outline of how [the representatives who reported to them] will hold [them]selves and [their] customers to this plan." In other words, salespeople were to negotiate prescription quotas with the doctors in their territories. These quotas had no apparent relationship to either medical necessity or patient needs, and the jury had an ample basis for inferring that Lee followed Simon's instructions.

Here, too, Lee's experience with Dr. Madison exemplifies the point. As a speaker, Dr. Madison was expected to maintain or exceed previous prescription-writing numbers. When Dr. Madison fell short, Lee would order a sales representative "to continue to put pressure on [Dr. Madison]" and tell the doctor "that if he's going to keep doing these programs, he needs to keep his writing up." There was no medically informed rationale for Dr. Madison's quota, and his agreement to abide by such a quota is a surefire sign that Lee knew that, under that agreement, Dr. Madison would be prescribing Subsys illegitimately. Cf. United States v. Hughes, 895 F.2d 1135, 1142 (6th Cir. 1990) (reaching similar conclusion regarding quota for blood tests). Her incessant enforcement of

- 41 -

the quota therefore is evidence that she intended for Dr. Madison to write those illegitimate prescriptions. The way that Lee did business with Dr. Madison is emblematic of her intent to have health-care practitioners forsake medical necessity for financial gain.

We conclude that the adverse finding against Lee as to the CSA predicates was supported by the record and, therefore, should have been allowed to stand. And as with Kapoor, see supra Part III(A), this holding dictates that we reinstate the jury's findings as to the honest-services predicates. It follows that we must reverse the district court's partial grant of the Rule 29(c) motion in favor of Lee as it pertains to both the CSA and honest-services predicates.

### C

The district court set aside the jury's finding that Simon was guilty of conspiracy to commit racketeering activities through a pattern of racketeering acts that included the CSA and honest-services predicates. Once again, we disagree. On this record, a reasonable jury could conclude that Simon (also a regional manager) intended health-care providers to prescribe Subsys outside the usual course of professional practice.

Simon encouraged the sales force to agree with each practitioner on a "specific number of scripts per week" — a quota — and to "push the dose." Relatedly, sales representatives under

- 42 -

his supervision pressured health-care practitioners to write medically illegitimate prescriptions.  For example, nurse Heather Alfonso agreed with her sales representative "to do one to two scripts per week."  She later admitted that she "had come to rely on th[e] extra money" and had "broke[n her] duty to patients."  So, too, Dr. Awerbuch was informed, at Simon's behest, that "the average of his prescriptions was very low, within the one to 200 microgram range."  As he recalled it, he then "started prescribing [Subsys] to patients who didn't really even need to be on it just to increase [his] numbers."

A reasonable jury could infer from the evidence that illegitimate prescriptions were not an unintended consequence of Simon's sales techniques but, rather, were a goal.  With an eye on revenue, Simon specifically sought to have practitioners prescribe Subsys to patients who did not need it.  It was Simon, for instance, who endeavored to enforce a minimum-dosage agreement with Dr. Somerville.  As a result, Dr. Somerville entered into a Faustian bargain with Insys that required, in Simon's own words, "every refill" to be for at least 180 micrograms.  In facilitating this arrangement, Simon not only knew that prescriptions would thereafter be untethered from patients' medical histories but also solicited precisely that outcome.  As one defense expert explained, a doctor "decide[s]" whether the medication is warranted "at the moment while [she's] seeing the patient," not "a week in advance."

Accordingly, a reasonable jury could find that Simon intended doctors to prescribe Subsys outside the course of professional practice because his quota arrangements required them to commit both to specific numbers of Subsys prescriptions and to specific dosages before they had a chance either to examine their patients or to assess patients' medical needs. See Hughes, 895 F.2d at 1142; United States v. Mahar, 801 F.2d 1477, 1487 (6th Cir. 1986) ("[T]hat patients were regularly sold controlled substances . . . selected by non-physician[s] . . . would further support a finding that controlled substances were issued outside the usual course of medical practice and for no legitimate medical purpose.").

We conclude that the adverse finding against Simon as to the CSA predicates was supported by the record and, therefore, should have been allowed to stand. And as with Kapoor, see supra Part III(A), this holding dictates that we reinstate the jury's findings as to the honest-services predicates. It follows that we must reverse the district court's partial grant of the Rule 29(c) motion in favor of Simon as it pertains to both the CSA and honest-services predicates.

**D**

As with Kapoor, Lee, and Simon, the district court set aside the jury's finding that Rowan was guilty of conspiracy to commit racketeering activities through a pattern of racketeering

acts that included the CSA and honest-services predicates. Here, too, the evidence supports a finding that Rowan intended doctors to write medically illegitimate prescriptions. Rowan worked hard to develop quota agreements. For example, he was not shy about communicating his prescription expectations to Dr. Couch. According to one witness, Rowan gave Dr. Couch "a hard time about the fact he hadn't been prescribing enough" and threatened to "take[] away" the speaking programs (and, thus, the kickback payments) if Dr. Couch "wasn't prescribing enough." Rowan's aggressive enforcement of prescription quotas is evidence that he knew that he was soliciting prescriptions that were not medically necessary. See Hughes, 895 F.2d at 1135. Given that knowledge, the kickbacks that Rowan was arranging constituted incentives for prescribers to prescribe Subsys illicitly. See id.

The jury also heard evidence that Rowan had reason to believe that successful performance of his job depended on promoting illicit prescription-writing. His dealings with Dr. Ruan illustrate this point. Rowan spoke directly with Dr. Ruan to make clear that Insys would "pay [Dr. Ruan] as much as we possibly and humanly can in exchange to write as much Subsys as [Dr. Ruan] humanly can." In the same vein, the government introduced evidence that Rowan understood that Dr. Ruan would find a way to prescribe more as long as the dollars kept flowing. The facts on the ground confirmed Rowan's understanding: Dr. Ruan ultimately wrote enough

Subsys prescriptions to boost Rowan into a position as Insys's top sales representative anywhere in the country. Moreover, Rowan's soaring sales figures exemplified the success of the kickback scheme, and he was repeatedly mentioned in the 8:30 a.m. management calls as a poster child for the proposition that "if you give these [doctors] programs, they're going to write the drug for you."

There was more. After the DEA froze opioid shipments to the pharmacy that principally filled Dr. Ruan's prescriptions, Rowan learned that the pharmacy had access to an "unlimited supply" of a competing opioid. He learned as well that the pharmacy wanted not only a similar arrangement for Subsys in order to circumvent "limits on [Schedule II drugs] in place by [the] current wholesaler" but also "to ensure uninterrupted delivery to patients of Dr. [Ruan]." Although by then Rowan either knew or was willfully ignorant of Dr. Ruan's pill mill tendencies, he nonetheless became involved in negotiating a direct-ship agreement for Dr. Ruan. He (along with Kapoor and Babich) attended the dinner meeting with Dr. Ruan at which the direct-ship agreement was finalized.

Taking this proof in the light most favorable to the verdict, a reasonable jury could conclude that Rowan intended Drs. Couch and Ruan to prescribe Subsys outside the accepted course of medical practice. See Volkman, 797 F.3d at 391. Because the record supports a determination that Rowan agreed to commit CSA

violations, the jury's finding to that effect should not have been vacated.  See Kilmartin, 944 F.3d at 325.  And as with Kapoor, see supra Part III(A), this holding dictates that we reinstate the jury's findings as to the honest-services predicates.  It follows that we must reverse the district court's partial grant of the Rule 29(c) motion in favor of Rowan as it pertains to both the CSA and honest-services predicates.

**E**

We add a coda.  As said, the district court rested its vacation of certain predicates on the so-called equipoise principle, holding that because the proof "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," Gurry, 427 F. Supp. 3d at 186 (quoting Burgos, 703 F.3d at 10), those predicate-act findings should be set aside.  We conclude that the equipoise principle was inapposite:  the evidence, viewed in the requisite light, was not so evenly balanced.  We summarize our reasoning.

We start with common ground:  we agree with the district court that the equipoise principle is entrenched in this circuit's jurisprudence.  When "the 'evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged,' this court must reverse the conviction."  United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995) (quoting United

States v. Sanchez, 961 F.2d 1169, 1173 (5th Cir. 1992)).  But "this equal-evidence rule takes hold only after [the inquiring court] ha[s] drawn all reasonable inferences in favor of the verdict." Magraw v. Roden, 743 F.3d 1, 5 (1st Cir. 2014) (emphasis in original).  Here — as we already have explained — the evidence, viewed in the light most favorable to the jury verdicts, clearly favors a finding that the defendants conspired to distribute Subsys even when the drug served no legitimate medical purpose.  See supra Parts III(A)-(D).  "When the[se] pieces of evidence are layered, with inferences taken in the government's favor, this is not a case in equipoise."  United States v. Ortiz, 447 F.3d 28, 34 (1st Cir. 2006).  Rather, it is a case in which a jury could find, beyond a reasonable doubt, that the four affected defendants (Kapoor, Lee, Simon, and Rowan) conspired with health-care practitioners to write Subsys prescriptions outside the course of accepted medical practice and without any medical justification. We conclude, therefore, that the equipoise principle simply did not apply.  To the contrary, this is a case in which the jury supportably found that the government had proved the CSA and honest-services predicates beyond a reasonable doubt.  It follows, then, that the district court erred in vacating those findings.

**IV**

The jury found all five defendants guilty with respect to the mail- and wire-fraud predicates.  In their joint Rule 29(c)

motion, four of the defendants (Kapoor, Lee, Simon, and Rowan) challenge the sufficiency of the evidence underlying these findings.[6]  As the district court saw it, however, the evidence supported those portions of the jury's findings and, thus, left them intact.  The four named defendants appeal that ruling.

The mail-fraud statute prohibits use of the mails in connection with a "scheme or artifice to defraud."  18 U.S.C. § 1341.  To establish the commission of this offense, the government must show a scheme to defraud using false pretenses, the defendant's knowing and willing participation in the scheme with the intent to defraud, and the use of the mails in furtherance of that scheme.  See United States v. Soto, 799 F.3d 68, 92 (1st Cir. 2015).

The mail- and wire-fraud offenses share common elements.  They differ only in that, to prove a violation of the wire-fraud statute, the government must establish the use of wires (rather than the use of the mails) in furtherance of the alleged scheme.  See United States v. Arif, 897 F.3d 1, 9 (1st Cir. 2018).

**A**

We start with Kapoor's claims of evidentiary insufficiency with respect to the mail-fraud predicate.  We can make short shrift of them.

---

[6] Gurry separately challenges these findings in his motion for a new trial.  See infra Part XII.

**1**

Kapoor disputes the sufficiency of the evidence in connection with the mail-fraud predicate only with respect to the third element: whether the use of the mails furthered the alleged scheme. To this end, he argues that the mailed bribes to practitioners did not further the misrepresentations to insurers regarding patients' conditions. We do not agree.

The "in furtherance" requirement is to be read broadly. United States v. Hebshie, 549 F.3d 30, 36 (1st Cir. 2008). "[T]he use of the mails need not be an essential element of the scheme." Schmuck v. United States, 489 U.S. 705, 710 (1989). To prove this element, the government need only show that the mailing was "incident to an essential part of the scheme," id. at 711 (quoting Pereira v. United States, 347 U.S. 1, 8 (1954)), or "a step in [the] plot," id. (quoting Badders v. United States, 240 U.S. 391, 394 (1916)). We therefore parse the record to determine whether the evidence shows some "connection or relationship" between the mailing and the fraudulent scheme. Hebshie, 549 F.3d at 36 (quoting United States v. Pimental, 380 F.3d 575, 587 n.5 (1st Cir. 2004)).

We find that the record shows a sufficient connection. The mailed bribes generated prescriptions, which were fraudulently processed through the IRC's authorization scheme. And in order to facilitate the fraudulent processing of prior-authorization

- 50 -

requests, Insys offered business liaisons to whales (prolific prescribers) who received bribes through the mail. Such bribe recipients included Drs. Awerbuch, Chun, and Ahmad.

"The relevant question at all times is whether the mailing is part of the execution of the scheme." Schmuck, 489 U.S. at 715. Because the scheme alleged here involved mailing bribes for writing medically illegitimate Subsys prescriptions and then obtaining insurance payments for those prescriptions, we conclude that a jury reasonably could answer this question in the affirmative.

Kapoor resists this conclusion. He argues that because the IRC processed all the prescriptions that it received (regardless of whether the prescribing doctor was bribed), the scheme to defraud insurers did not "depend" on the bribes mailed to doctors. In support, Kapoor notes that the bribed doctors were only a "small fraction" of the doctors whose prescriptions were fraudulently processed through the IRC.

This argument misses the mark: the government need not show that the fraudulent scheme would have petered out without the bribes. The mail-fraud statute does "not require[] a 'but-for' link between a mailing and the fraudulent scheme." Hebshie, 549 F.3d at 36 (quoting Pimental, 380 F.3d at 587). It requires only a connection between the two, and the record, read in the light most favorable to the government, supports an inference that the

bribes, in increasing the volume of prescriptions, facilitated the scheme. No more is exigible to uphold the jury's mail-fraud finding.

**2**

As a fallback, Kapoor essays a constructive amendment claim. In mounting this claim, he says that the mail-fraud scheme described by the district court differed from that charged in the indictment. The government, he adds, failed to adduce sufficient proof of the latter scheme.

Specifically, he calls our attention to paragraph 31 of the indictment, in which the grand jury alleged that "[h]ad the insurers known that the defendants gave bribes and kickbacks to the targeted practitioners, the insurers would not have authorized payment for Subsys." Because the government did not show that Kapoor "intended for the IRC to affirmatively misrepresent" Insys's bribes to practitioners, his thesis runs, it failed to substantiate the scheme it alleged. Although Kapoor gets high marks for ingenuity, his claim fails the constructive-amendment test.

"A constructive amendment 'occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them.'" United States v. Dunn, 758 F.2d 30, 35 (1st Cir. 1985) (quoting Gaither v. United States, 413 F.2d 1061, 1071-72 (D.C.

Cir. 1969)). "[O]ur practice has been to look to statutory elements in response to claims by defendants that 'the crime charged' has been changed." United States v. Mubayyid, 658 F.3d 35, 51 (1st Cir. 2011). Therefore, "[s]o long as the statutory violation remains the same, the jury can convict even if the facts found are somewhat different than those charged." Id. (quoting United States v. Twitty, 72 F.3d 228, 231 (1st Cir. 1995)); see United States v. Dowdell, 595 F.3d 50, 68 (1st Cir. 2010).

In this case, the putative amendment occurred after trial (when the court denied the defendants' joint Rule 29(c) motion). Thus, Kapoor had no realistic opportunity to assert his constructive amendment claim below. Consequently, this claim of error engenders de novo review. See United States v. Rodriguez, 919 F.3d 629, 635 (1st Cir. 2019); United States v. Hernández, 490 F.3d 81, 83 (1st Cir. 2007).

We discern nothing resembling a constructive amendment here. The crime charged was not altered because the language in paragraph 31 did not implicate the statutory elements of the RICO conspiracy. To prove a RICO conspiracy, "it is enough to prove that a defendant agreed with one or more others that two predicate offenses be committed." Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1562 (1st Cir. 1994) (emphasis in original). The predicate offenses themselves, however, are not elements required to be proved. See id. Since Kapoor was not "convicted of a crime

- 53 -

other than that charged in the indictment," no constructive amendment occurred.[7]  United States v. Day, 700 F.3d 713, 720 (4th Cir. 2012) (quoting United States v. Randall, 171 F.3d 195, 203 (4th Cir. 1999)).

"[T]he rule against constructive amendments . . . is focused not on particular theories of liability but on the offenses charged in an indictment."  Id. at 720 (emphasis in original). Although the district court's order "eliminated a theory of liability" alleged in paragraph 31, United States v. Celestin, 612 F.3d 14, 25 (1st Cir. 2010), "the statutory violation remain[ed] the same," Mubayyid, 658 F.3d at 51 (quoting Twitty, 72 F.3d at 231).  For that reason, the district court's order did not constructively amend the indictment in any forbidden way.  See Celestin, 612 F.3d at 25; United States v. Miller, 471 U.S. 130, 145 (1985); cf. United States v. Mueffelman, 470 F.3d 33, 38 (1st Cir. 2006) (distinguishing forbidden constructive amendment from

---

[7] For the sake of completeness, we note that the challenged language tracked one of the government's earlier theories of fraud liability.  The government originally alleged that each time Insys submitted a Subsys authorization request on behalf of a bribed doctor, the defendants committed fraud just by omitting information about the bribe.  The district court rejected this theory, ruling from the bench that not "every prescription is bogus just because there was a kickback behind it."  Hence, the court said, there was "[no] obligation to disclose [the kickback]."  From that point forward, the government elected to pursue only the remaining mail-fraud allegations in the indictment.

one alleging "a scheme similar to but somewhat narrower in breadth and malignity than that charged in the indictment").

**B**

Lee's challenge to the sufficiency of the evidence underlying the mail- and wire-fraud predicates need not detain us. We previously have limned the elements of those offenses. Lee disputes only the second element of each offense — her knowing and willing participation in the scheme with the intent to defraud — and claims that the government failed to show that she had the requisite knowledge of, or involvement in, the scheme. The record belies her protestations.

Wire transmission of authorization requests and approvals was essential to the operation of the IRC, and the government's proof showed that Lee had both extensive interactions with the IRC and a working knowledge of the approval process. A few examples will suffice to hammer home the point:

- During the IRC's pilot phase, Gurrieri communicated directly with Lee about Dr. Awerbuch's prescriptions. Lee received a list of over one hundred prescriptions that the IRC was attempting to process on Dr. Awerbuch's behalf.

- Lee supervised the representative assigned to Dr. Awerbuch, who helped process the authorization requests; she also arranged the hiring of Dr.

Awerbuch's niece as a business liaison to "fill out the forms," "get the prescriptions pushed through," and "work[] with th[e] IRC."

- Lee was "very close" to an IRC authorization specialist and lobbied for her promotion.

- Lee tried very hard to maximize the authorization rate because she understood that Insys got paid (and her own compensation increased) only if insurers approved the drug.

We add, moreover, that the record supports an inference that Lee pushed for prior authorizations with knowledge that the information that the IRC relayed to insurers was inaccurate. She worked closely with Drs. Madison and Awerbuch, who were two of the most prolific prescribers of Subsys in the country. The record likewise supports an inference that Lee knew that these prescribers were writing medically illegitimate prescriptions. Because these prescriptions would not get insurance approval organically, sales representatives had to be "coach[ed]" on the misleading diagnosis codes to be provided to insurers, and Lee was aware of this coaching because she was copied in emails that discussed it.

On this record, a jury unquestionably could conclude that Lee knew that the IRC was processing medically illegitimate prescriptions by deliberately providing insurers misleading information. The jury also could conclude that Lee agreed to

facilitate the fraudulent scheme by generating more prescriptions for the IRC to process through mailed bribes and by streamlining Dr. Madison's and Dr. Awerbuch's insurance-authorization processes. The district court, therefore, did not err in denying Lee's motion for judgment of acquittal on the mail- and wire-fraud predicates.

## C

Simon's evidentiary insufficiency claim with respect to the mail- and wire-fraud predicates is easily dispatched. Like Lee, Simon disclaims knowledge of or involvement in the insurance-fraud scheme. See Soto, 799 F.3d at 92; Arif, 897 F.3d at 9. The record, however, tells a different tale: it supports the jury's findings as to both predicates.

The evidence shows that Simon understood, assisted, and furthered the IRC's fraudulent activities. The sales representatives who reported to him informed him whenever a doctor granted the IRC permission to contact an insurer for an authorization, and he was copied on emails reporting denials by insurers. To convey this information to senior management, Simon created "charts in progress" reports which documented the IRC's efforts to obtain authorization for each Subsys prescription. In addition, it was Simon who created the business liaison program. A jury reasonably could envision these efforts as knowing facilitation of the IRC's corrupt authorization processes.

The record also supports an inference that Simon sought to maximize the IRC's success despite knowing that the information the authorization specialists supplied to insurers was misleading and/or false. He was an occasional participant in the 8:30 a.m. daily management calls, during which Kapoor and other senior executives regularly discussed the IRC and strategies for obtaining insurer authorizations. Such strategies included the use of misleading words, phrases, and diagnosis codes, as well as the "spiel." What is more, the government introduced evidence that Simon saw these strategies in action when he visited the IRC and listened to calls during which employees contacted insurers and requested Subsys authorizations. From this evidence, a jury reasonably could find that Simon had knowledge of the IRC's fraudulent activities, yet chose to feed the IRC more prescriptions by bribing doctors through the mail. It follows that the district court did not err in denying Simon's motion for judgment of acquittal on the mail- and wire-fraud predicates.

**D**

Rowan's claim of error with respect to the sufficiency of the evidence underlying the mail- and wire-fraud predicates is bootless. He, too, challenges only the intent element of the jury's adverse findings on the mail- and wire-fraud predicates.[8]

---

[8] The government asserts that Rowan failed to preserve this claim of error and that, therefore, review is only "for clear and

See Soto, 799 F.3d at 92; Arif, 897 F.3d at 9.  Our review discloses, however, that the record is shot full of evidence that Rowan monitored, facilitated, and participated in the IRC authorization process.  For instance, he personally arranged a liaison for Dr. Chun and he instructed his subordinate (a sales representative) to have the "[prior authorization] form filled out every day with update to [Gurry]" and "to do whatever we could to help and assist in getting that insurance pull-through."  Various of his subordinates reported to Rowan to confirm that doctors had completed IRC opt-in forms and to alert him when doctors encountered difficulty obtaining insurance approvals.  A jury reasonably could conclude that these were deliberate efforts to support the corrupt IRC authorization procedure.

To cinch the matter, a jury reasonably could conclude that Rowan undertook these efforts notwithstanding his knowledge that the IRC was deliberately misleading insurers.  Rowan had every reason to believe that Dr. Ruan was prescribing Subsys illegitimately, and a reasonable jury could infer that Rowan knew that the IRC's efforts to get prior authorization for many of Dr. Ruan's prescriptions were likewise illegitimate.  His attendance at an IRC training session corroborates such an inference.  At

gross injustice."  United States v. Foley, 783 F.3d 7, 12 (1st Cir. 2015).  We assume, without deciding, that the claim was preserved and, therefore, engenders de novo review.  See Kilmartin, 944 F.3d at 325.

that session, Rowan heard about the IRC's "history of cancer" practice, including an explicit instruction to the authorization specialists to include a reference to cancer even if "that's not what we're seeing them for" because such a reference meant a "sure approval" from insurers. So, too, Rowan learned that the IRC maintained a list of drugs for authorization specialists to include as tried-and-failed medications — a list that was to be used liberally even if particular patients had not furnished any information about prior medications. It thus seems nose-on-the-face plain that, after this session, Rowan knew that the IRC was defrauding insurers both because it cited bogus medical rationales in support of prescriptions and because it provided apocryphal lists of tried-and-failed medications. Yet, he continued to work hand-in-glove with the IRC.

We do not gainsay that the jury was free to conclude, as Rowan argues, that the IRC training session was innocuous. But there were two sides to this particular story, and "it [was] within the jury's purview to evaluate [these] competing factual inferences." United States v. Ridolfi, 768 F.3d 57, 61 (1st Cir. 2014). Rowan's efforts to bribe doctors through the mail and to push through Dr. Ruan's prescriptions despite Rowan's knowledge of what was going on supports the conclusion that he knowingly and willingly participated in the scheme with the intent to defraud insurers. It follows that the district court did not err in

denying Rowan's motion for judgment of acquittal on the mail- and wire-fraud predicates.

## V

The district court admitted at trial testimony of nine patients who had received Subsys prescriptions from doctors who participated in the kickback scheme. All of the defendants challenge the admission of their testimony as irrelevant and unduly prejudicial. Some stage-setting is needed.

The defendants had anticipated the government's presentation of evidence that patients had suffered harm from taking Subsys. Prior to the trial, they moved to exclude such evidence in its totality. The district court granted their motion in part, leaving the government free to present testimony about "the medical care that patients received from co-conspirator physicians" and their "medical status." This evidence was allowed for the purpose of showing "that prescribing was not medically necessary or was in excess of what was medically necessary, or that a patient's medical status was different from what was represented to insurers in furtherance of claims for reimbursement." The court also allowed the introduction of evidence showing "that a patient became addicted to Subsys, the medical consequences of that addiction, and whether and how prescribing practices changed thereafter." Striving to strike a balance, though, the court prohibited "evidence concerning the

social consequences to the patient of wrongful prescribing or addiction, such as loss of employment, erosion of familial relationships, and the like."

At the final pretrial conference, the defendants renewed their objections to patient-harm evidence. The government argued that it should be allowed to elicit testimony as to patients' medical histories (e.g., whether a patient had cancer) "because the IRC, which is run by Insys, is telling the pharmacy benefit managers and other insurers that patients have cancer when the patient doesn't have cancer." This testimony, the government said, was intended "primarily to prove the fraud." So, too, the government wanted to adduce testimony about the effects that Subsys had on patients — that they "couldn't function[,] [t]hey slept all day[,] [t]hey became addicted."

The district court essentially reaffirmed its earlier ruling. The court noted that the charged conspiracy involved "not just defrauding the insurance company," but also "overprescri[ption] and increase [in] prescriptions." It therefore concluded that the government should be "allowed to put that evidence on to show that [the defendants] succeeded in their objective, which is evidence of the fact that it was their objective."

During trial, the defendants objected for a third time to evidence of patient harm. In response, the district court

reiterated that it would not broadly preclude such testimony. When the defendants renewed their objections yet again, the court reiterated that testimony regarding addiction was "fair game."

All in all, nine patients testified about the debilitating effects of addiction that they experienced while ingesting Subsys. We offer a representative sampling of this testimony:

- Cathy Avers testified that, as a result of taking Subsys, she "bec[a]me an addict" such that "[n]o matter how much [she] took, eventually it just wasn't enough." She testified to side effects such as "having a hard time functioning, standing up, going to sleep. It was such an impact on [her] being able to get up, out of bed, get dressed, and do anything." She confirmed that the information Insys had provided to her insurer — that she had a current cancer diagnosis, was taking morphine and hydromorphone, and was using a fentanyl patch — was apocryphal.

- Paul Lara testified that, while taking Subsys, he wound up "not finding [his] way home in a town [he'd] lived in all [his] life" and having "to call [his] wife to get directions home." He repeatedly hallucinated and "thought [he] was going crazy."

He could not follow what customers were saying to him at work and once "literally three or four" of his teeth "[fell] out right there [while] talking to a customer." He also confirmed that Insys's representations to his insurer that he had a current diagnosis of cancer were spurious.

- Sara Dawes testified that, while taking Subsys, she was "unable to function" and spent "most of [her] time in bed." When she stopped taking Subsys, she "was very, very, very sick and mentally couldn't hold it together" to the point that she had "a breakdown" and "drove off and left [her] kids on Christmas." She also testified that, contrary to what Insys had told her insurer, she never had cancer, never had taken methadone, and did not have difficulty ingesting generic fentanyl products.

- Betty Carrera testified that, while taking Subsys, she began having such phantasmagoric hallucinations that the police had to be called several times. She could not function and spent her days sleeping. She said that, when withdrawing from Subsys, she had nightmares and hallucinations, and she would "[wake] up at night screaming." She also

contradicted Insys's representations to her insurer and testified that she never had issues swallowing.

- Woodrow Chestang described "slobber . . . just run[ning] down [his] mouth," watching the clock, and craving more Subsys between doses. When he was unable to get Subsys, he experienced delirium tremens, nausea, and inability to eat or drink. He sometimes curled "into a fetal position" and realized that he was "burn[ing] up with fever." He added that, contrary to the information that Insys had given to his insurer, he neither had a history of cancer nor had previously been prescribed generic opioid containing fentanyl.

- Scott Byrd testified that Subsys was "life-changing" because "[i]t put [him] into an addiction state that [he] almost couldn't come out of." Because he used more than the quantity that his doctor had prescribed, he ran out early and experienced major withdrawal. He also swore that the signature on the opt-in form purportedly authorizing Insys to contact his insurer on his behalf was not his and, in fact, misspelled his name.

- Kendra Skalnican testified that she developed an addiction after starting on Subsys, and, as a result, began to take more of the medication than had been prescribed. When she ran out, she experienced severe withdrawal, sweating, vomiting, diarrhea, and pain all over her body. She told the jury that Subsys "made [her] addicted" and "[she] slept a lot of [her] life away." She also testified — contrary to information provided by Insys to her insurer — that she never had issue swallowing pills and never had tried other fentanyl products.

- Michelle DiLisio (previously Kamzyuk) testified that, while taking Subsys, she was lethargic, fatigued, dizzy, and felt "out of it." She reported that she suffered from severe withdrawal symptoms after she stopped taking the medication. And she made clear that the information that Insys had furnished to her insurer was false: she never had "any cancer ever" and, specifically, she never had ovarian cancer (indeed, she had undergone ovary-removal surgery years before Subsys had been prescribed for her).

- Alicia Hinesley testified that Subsys made her "extremely sleepy" and led to difficulty in

- 66 -

thinking. Sometimes she would sit or sleep all day. Belying Insys's statements that she was experiencing breakthrough cancer pain, she flatly denied that she ever had cancer.

After the jury verdicts had been returned, the defendants moved for a new trial. They argued that the admission of the patient-harm testimony constituted reversible error. The district court thought not: it concluded that "[t]he patient testimony at trial conformed to the Court's motion in limine ruling in which it allowed only limited use of patient testimony and carved out most inflammatory aspects, such as the social consequences of addiction." Gurry, 427 F. Supp. 3d at 203. The testimony, the court said, "was relevant to show the medical care that patients received from co-conspirator prescribers, to demonstrate that certain prescriptions were not medically necessary or were excessive, and to support claims that a patient's medical status was different from what was represented to insurers." Id.

It hardly bears repeating that a trial court enjoys considerable discretion with respect to its evidentiary rulings. See United States v. Zaccaria, 240 F.3d 75, 78 (1st Cir. 2001). We review the rulings that the defendants challenge here only for abuse of that discretion. See Iacobucci v. Boulter, 193 F.3d 14, 20 (1st Cir. 1999).

**A**

We start with the defendants' claim that the challenged testimony was irrelevant. The standard for relevancy is not exacting. See United States v. Rivera Calderón, 578 F.3d 78, 97 (1st Cir. 2009). The patient-harm testimony is relevant if it has the "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id. (quoting Fed. R. Evid. 401).

The district court appropriately found that the patient-harm testimony was relevant. To prove the CSA predicates, the government had to show that the defendants agreed that a health-care practitioner would prescribe Subsys outside the usual course of medical practice and without any legitimate medical purpose. See Volkman, 797 F.3d at 391. The evidence of the patients' altered behavior, addiction, and withdrawal symptoms was plainly relevant to show that the doctors' treatment was outside the course of professional practice. This is particularly true where, as here, each doctor continued to prescribe Subsys to his or her patient despite knowing of the patient's addiction. Taking a practical view of what had transpired, the jury reasonably could have regarded the patient-harm testimony as powerful proof both that the coconspirator doctors prescribed Subsys in the absence of any medical necessity and that they failed to minimize the risk of

adverse effects when setting dosages.  In fine, the patient-harm testimony was relevant to show that the doctors contravened their professional obligations.  See United States v. Singh, 54 F.3d 1182, 1187 (4th Cir. 1995).  And we think it obvious that evidence that the doctors prescribed Subsys outside the usual course of professional practice while receiving kickbacks constitutes evidence relevant to show that the defendants had entered into an agreement to bring about exactly that result.  See United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir. 1989) (explaining that "[t]he actions, as well as the words of the [coconspirators], are evidence of the existence and scope of a conspiracy").  On this record, evidence about the exploitation of addiction was relevant to show that all of the coconspirators, including the defendants, viewed addiction less as a societal problem and more as a pathway to predatory profits.

On the same basis, we dismiss Gurry's contention that he "had no connection to prescribers' medical decision-making."  The patient-harm testimony is relevant as to Gurry because it helped establish the scope of the conspiracy.  See id.  "The fact that [Gurry] participated in one retail link of the distribution chain, knowing that it extended beyond his individual role, was sufficient" to establish relevancy as to him.  Id.

The defendants erect a straw man.  They submit that the patient-harm testimony "said nothing about what [they], who had no

- 69 -

contact with any of these patients and no knowledge of [what] they were affected by Subsys, specifically intended." But as we already have discussed, a core component of the conspiracy to distribute Subsys was influencing doctors to "push the dose." The most logical reason for the defendants' unremitting efforts to increase dosages was their knowledge that patients on higher doses would refill their Subsys prescriptions while patients on lower doses would not. The patient-harm testimony showed vividly just how the "effective dose" messaging furthered the scheme.

At the risk of carting coal to Newcastle, we add that the patient-harm testimony also helped to explain how the defendants could expect doctors to fulfill their commitments to Insys representatives, that is, to meet quotas obligating them to prescribe inordinately high amounts of Subsys. The patients trusted the doctors; the doctors provided a limited explanation of the drug to the patients; and by the time the patients realized they were addicted, they were powerless to refrain from seeking more and more Subsys.

To say more about relevancy would be to paint the lily. Because the patient-harm testimony tended to show the ins and outs of the defendants' scheme, it was within the district court's discretion to deem this evidence relevant. See United States v. Hale, 857 F.3d 158, 171 (4th Cir. 2017).

**B**

The defendants next argue that the patient-harm testimony, even if relevant, was unfairly prejudicial. In examining this claim, we begin with evidentiary bedrock. A district court may exclude relevant evidence if an objecting party can show that "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. But under Rule 403, one size does not fit all. Thus, we afford the district court "considerable latitude in steadying the balance which Rule 403 demands." United States v. Cadden, 965 F.3d 1, 22 (1st Cir. 2020) (quoting United States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989).

Through serial rulings, the court below exercised care in weighing the considerations affecting the Rule 403 balance. From the beginning, the court precluded evidence concerning the social consequences of addiction and — in its own words — took pains to "carve[] out most inflammatory aspects" of the testimony. Gurry, 427 F. Supp. 3d at 203. Even so, the defendants complain that the court did not carve out a sufficiently wide exclusionary swath.

The defendants' argument relies primarily on our decision in Kilmartin, 944 F.3d at 315. Kilmartin, though, is a horse of a different hue. There, the government prosecuted — for fraud-related crimes — a defendant who advertised cyanide to

suicidal individuals, collected their money, and sent them Epsom salts instead.  See id. at 323-24.  At trial, the government offered as "anecdotal background evidence" testimony from victims (other than those named in the charged counts) who had tried to purchase cyanide from the defendant.  Id. at 333.  This testimony "went into excruciating detail about the . . . victims' personal lives, medical issues, histories of depression, earlier suicide attempts, suicidal motivations, and the like."  Id. at 335.  We later described the testimony as "copious," "emotionally charged," and as having "virtually no probative value."  Id. at 337.  Because the inordinate potential for prejudice "substantially outweighed" the dubious probative value of the anecdotal evidence, we held that the district court abused its discretion in admitting that evidence.  Id. at 338.

This case is a world apart from Kilmartin.  The patient-harm testimony here was relatively brief and squarely probative, established that the patients became addicted to Subsys and suffered withdrawal symptoms, shed a bright light on the prescribing habits of the coconspirator physicians, tied the "effective dose" messaging into the scheme, and catalogued (in checklist fashion) many of the ways in which the IRC misrepresented patient information.  Perhaps most importantly, the patient-harm testimony explained how the charged conspiracy was able to function and how it generated product demand.  And, finally, the testimony

was concise:  no testifying patient was permitted to dwell unduly on the harm that he or she suffered.  Viewed in this perspective, the patient-harm testimony was less like the challenged testimony in Kilmartin and more like the victim testimony in Cadden, 965 F.3d at 22 — the admission of which we approved because it was relatively brief and the trial court precluded more graphic details.

To be sure, the patient-harm testimony packed a punch. Nevertheless, the issue is not prejudice simpliciter but, rather, whether particular evidence crosses the line into the forbidden realm of unfair prejudice.[9]  See United States v. Pitrone, 115 F.3d 1, 8 (1st Cir. 1997) ("[I]t is only unfair prejudice against which the law protects." (emphasis in original)).  The fact that addiction is ugly does not bar the government from offering evidence about it when — as in this case — the defendants' scheme has made addiction relevant and probative.  See, e.g., United States v. Morales-Aldahondo, 524 F.3d 115, 120 (1st Cir. 2008) (holding that, although admitted images of child pornography "undoubtedly had an emotional impact on jurors," district court "properly balanced the competing concerns of Rule 403" when evidence was probative and court "limit[ed] the number of images

---

[9] We have observed before that "all evidence is meant to be prejudicial."  Rodriguez-Estrada, 877 F.2d at 156.  If it was not intended to influence the jury in one way or another, it is unlikely that any party would seek to introduce it.

presented").  In the last analysis, a "court is not required to scrub the trial clean of all evidence that may have an emotional impact, where the evidence is part of the Government's narrative." Id. at 120 (internal quotation omitted).

We are aware that the defendants offered to stipulate that none of the testifying patients had cancer.  But such a stipulation was not an acceptable proxy for the patients' testimony.  The scope of the proffered stipulation was much narrower than the scope of the testimony, and the government was entitled to show (for example) other misrepresentations made by the IRC.  We consistently have rejected parties' attempts to insist that district courts accept stipulations that are not commensurate substitutes for live proof, see, e.g., Cadden, 965 F.3d at 22, and we do so here.

To sum up, we discern no abuse of discretion in the court's construction of the Rule 403 balance.  The patient-harm testimony bore on the government's theory of the case in salient ways, and the court took prudent steps to soften the emotional impact of the testimony. We have stated before that "[o]nly rarely — and in extraordinarily compelling circumstances — will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect."  United States v. Mehanna, 735 F.3d 32, 59 (1st Cir. 2013) (quoting Freeman v. Package Mach. Co., 865 F.2d

1331, 1340 (1st Cir. 1988)).  This is not so rare an instance, and the district court acted within the encincture of its discretion under Rule 403 in allowing the challenged testimony.

**C**

The defendants' challenge to the admissibility of the patient-harm testimony incorporates one last point.  They contend that the patient-harm testimony was cumulative of other proof.  They note, for example, that Dr. Awerbuch and Nurse Alfonso testified that their Subsys prescriptions were not medically necessary and that Gurrieri and other IRC staffers testified that they lied to insurers about patients' conditions.  Since the defendants did not raise this objection below, plain error review obtains.  See Taylor, 54 F.3d at 972-73; United States v. Nivica, 887 F.2d 1110, 1116 (1st Cir. 1989).

"The plain error hurdle is high," United States v. Hunnewell, 891 F.2d 955, 956 (1st Cir. 1989), and a purported error must (among other things) be "clear or obvious" in order to be "plain." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).  Cumulativeness is almost always a matter of degree, and the defendants' claim of cumulativeness — if it suggests an error at all — at most suggests an error that is neither clear nor obvious.  See United States v. Sepulveda, 15 F.3d 1161, 1185 (1st Cir. 1993) ("We have routinely found cumulative evidence impotent when

accidentally uncorked."). Plain error is, therefore, plainly absent.

## VI

Gurry — whom the jury acquitted with respect to the CSA and honest-services predicates — contends that the evidence admitted with respect to those predicates unfairly influenced the jury's findings against him on the mail- and wire-fraud predicates.[10]

This is, for all intents and purposes, a claim of prejudicial spillover. As relevant here, prejudicial spillover occurs when the evidence admitted to prove a charge as to which the defendant was acquitted "was so extensive, inflammatory, and prejudicial that it necessarily spilled over into the jury's consideration of [his] guilt on other charges." Mubayyid, 658 F.3d at 72.

To determine whether an unacceptable threat of prejudicial spillover materialized, we must evaluate whether the record evinces "a 'serious risk' that the joinder of offenses compromised a specific trial right or 'prevent[ed] the jury from

_____

[10] Although the other four defendants advanced similar contentions in their briefs, those contentions have been rendered moot by our vacatur of the district court's partial grant of their Rule 29(c) motions. See supra Part III (A)-(D); see also Mubayyid, 658 F.3d at 73 (holding claim of prejudicial spillover without merit after appellate court reinstated the previously vacated conviction).

making a reliable judgment about guilt or innocence.'" Id. (quoting United States v. Houle, 237 F.3d 71, 75-76 (1st Cir. 2001)). The devoir of persuasion rests with the defendant to show "prejudice so pervasive that a miscarriage of justice looms." United States v. Trainor, 477 F.3d 24, 36 (1st Cir. 2007) (quoting United States v. Levy-Cordero, 67 F.3d 1002, 1008 (1st Cir. 1995)).

In the court below, Gurry argued that the government's "accusation" that he and the other defendants intended to coax doctors to prescribe Subsys illegitimately, coupled with the patient-harm testimony, tainted the jury's findings against him on other matters. The district court rejected this argument and refused to order a new trial on this ground. See Gurry, 427 F. Supp. 3d at 196-97. It found that the patient-harm testimony was properly admitted as to all the defendants and all the charged predicates and observed that its jury instructions had been custom tailored to guard against prejudicial spillover. See id.

We review the district court's denial of a new trial based on allegations of prejudicial spillover for abuse of discretion. See United States v. Neal, 36 F.3d 1190, 1205 (1st Cir. 1994). We discern none.

At the outset, it bears mentioning that Gurry's argument repastinates much of the same ground covered in our discussion of the admissibility of the patient-harm testimony. See supra Part V. He was charged as a coconspirator and, thus, almost all of the

evidence properly admitted against other coconspirators was relevant to and independently admissible against him. See United States v. O'Bryant, 998 F.2d 21, 26 (1st Cir. 1993). And because the patient-harm testimony was independently admissible against Gurry, he hardly can be heard to complain about an untoward spillover effect. See id. Simply put, the government's case against Gurry would have comprised essentially the same evidence even if the government had not seen fit to charge him with the acquitted predicates.

We add that Gurry's argument that patient-harm testimony likely "incited [the jury's] ire" is severely wounded by his acquittal with respect to the CSA and honest-services predicates. That the jury's findings distinguished among defendants and differentiated among proposed predicates is strong evidence that no spillover prejudice occurred. See United States v. Williams, 809 F.2d 75, 88 (1st Cir. 1986); cf. United States v. Natanel, 938 F.2d 302, 308 (1st Cir. 1991) ("The introduction of evidence against other defendants cannot realistically be viewed as having jeopardized [the defendant's] chances on [one count] when the jury proved willing to treat the case against [him] on its own merits by acquitting him on the other counts."). Here, moreover, the jury differentiated not only between counts but among defendants — and that selectivity is "strong evidence" that the jury was not blinded by raw emotion but, rather, properly compartmentalized and

applied the law to the facts.  United States v. Bailey, 405 F.3d 102, 112 (1st Cir. 2005); see United States v. Dworken, 855 F.2d 12, 29 (1st Cir. 1988) (giving credence to "jury's ability to segregate the evidence and carefully weigh against which defendant it was applicable" (quoting United States v. Richman, 600 F.2d 286, 299-300 (1st Cir. 1979)).

Much of the credit for the jury's discernment must go to the district court.  The court excluded the most inflammatory evidence about the effects of Subsys and prudently instructed the jury both to treat each defendant individually and to weigh separately the evidence as to each defendant.  As a general rule, "instructing the jury to consider each charged offense, and any evidence relating to it, separately as to each defendant" constitutes an "adequate measure[] to guard against spillover prejudice."  United States v. Casas, 425 F.3d 23, 50 (1st Cir. 2005); see, e.g., United States v. Figueroa, 976 F.2d 1446, 1454 (1st Cir. 1992) (holding that "district court minimized any danger from prejudicial spillover through its repeated instructions that the jury was to give separate consideration to each charge against each defendant").  Gurry has not pointed to anything that would take this case out of the general rule.

Little more need be said.  The jury acquitted Gurry with respect to the CSA and honest-services predicates while at the same time finding the four other defendants guilty of those

charges.  This result constituted "an uncommonly convincing 'ex post validation' of the jury instructions."  Figueroa, 976 F.2d at 1454.  In the circumstances of this case, Gurry's claim of prejudicial spillover lacks force, and the district court acted well within the ambit of its discretion in refusing to grant him a new trial on that ground.

## VII

During pretrial proceedings, Lee moved for a severance of the charges against her.  See Fed. R. Crim. P. 14(a).  The district court denied her motion.  Lee assigns error.

## A

In support of severance, Lee argued below that the government charged two distinct conspiracies: one to bribe doctors who would prescribe Subsys indiscriminately and another to defraud insurers to pay for those prescriptions.  From this starting point, she asserted that a joint trial would prejudice her because she was not personally involved in the second of these conspiracies.  The district court denied her motion, concluding that Lee had failed to make a sufficient showing of potential prejudice.  Specifically, the court found that Lee had "fail[ed] to identify any evidence or argument that would not be admissible against her in a separate trial" and that her allegations of prejudice were wholly conclusory.

On appeal, Lee traverses the same terrain. Her case should have been severed, she submits, because she was a stranger to the IRC portion of the wrongdoing. We review the district court's denial of her motion for abuse of discretion. See United States v. Azor, 881 F.3d 1, 12 (1st Cir. 2017).

When — as in this case — an indictment charges a criminal conspiracy among multiple defendants, the government enjoys the benefit of a rebuttable presumption that a joint trial is appropriate. See United States v. Soto-Beníquez, 356 F.3d 1, 29 (1st Cir. 2003) (explaining that "the general rule is that those indicted together are tried together"); see also Zafiro v. United States, 506 U.S. 534, 537 (1993) (noting Supreme Court's "repeated[] . . . approv[al] of joint trials" for coconspirators). And in cases where joinder is proper, "[w]e must affirm the district court's denial of a motion to sever unless the defendant makes a strong and convincing showing of prejudice." United States v. Richardson, 515 F.3d 74, 81 (1st Cir. 2008) (internal citations omitted); see Azor, 881 F.3d at 12.

Here, we uphold the district court's refusal to sever for two reasons. First, the record contains substantial evidence showing Lee's involvement with the IRC (for instance, evidence showing that Lee sought to maximize the number of opt-in forms to be transmitted to the IRC and evidence showing that she supervised some of Insys's IRC authorization specialists). Second, because

the government charged and proved a single conspiracy and because Lee was charged and convicted as a coconspirator, virtually all of the evidence properly admitted against the other defendants (including evidence showing that the IRC was an integral part of the single conspiracy) was also admissible against Lee. See O'Bryant, 998 F.2d at 26; see also Richardson, 515 F.3d at 82 ("[T]his Court has repeatedly refused to overrule a denial of severance if substantially the same evidence would have been admitted in separate trials.").

Straining to show that she did not belong in the case, Lee identifies 34 witnesses who — she speculates — would not have been called to testify had she been tried alone. But the unadorned fact that additional witnesses will be called in a joint trial is not a cognizable basis for severance. The right to a severance necessarily entails a showing of prejudice, and Lee offers no explanation as to why the testimony of these witnesses (who, in her brief's words, "had nothing relevant or incriminating to say about Lee") prejudiced her in any way.

**B**

Lee plucks out of thin air a new assault on the denial of her motion for a severance. She contends, for the first time on appeal, that joinder was improper under Federal Rule of Criminal Procedure 8(b). This misjoinder, she says, independently demanded severance. Although we normally review the propriety of joinder

de novo, see Azor, 881 F.3d at 12, Lee's unpreserved contention engenders — at most — plain error review,[11] see United States v. Greenleaf, 692 F.2d 182, 187 n.4 (1st Cir. 1982); see also United States v. Ackerly, 981 F.3d 70, 74 (1st Cir. 2020).

Whatever the standard of review, a claim of misjoinder "requires reversal only if the misjoinder results in actual prejudice." United States v. Lane, 474 U.S. 438, 449 (1986); see United States v. Bruck, 152 F.3d 40, 44 (1st Cir. 1998). The movant must show that her joinder had a "substantial and injurious effect or influence in determining the jury's verdict." Bruck, 152 F.3d at 44 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Lee's feeble effort to show that her joinder was prejudicial falls far short.

Lee starts with the uncontroversial proposition that prejudicial joinder may entitle a defendant to a severance. See Natanel, 938 F.2d at 306. Lee has very little to say, though, about why her joinder was prejudicial. Her only argument seems to rest on her self-serving conclusion that "the Government misled the Court into believing that Lee 'dealt extensively' with the

---

[11] In all likelihood, the claim of misjoinder — which was available before trial but not raised by any pretrial motion — was waived. See Fed. R. Crim. P. 12(b)(3)(B)(iv). Here, however, the government has not suggested waiver, and we assume for argument's sake that the misjoinder claim is subject to appellate review (albeit only for plain error).

IRC."  This conclusion, in turn, circles back to her protest that she had "no criminal association" with the IRC side of the venture.

As we already have explained, this protest is at odds with the record.  In certain cases, evidence at trial may "serv[e] as an ex post assurance that joinder was a step founded on a reasonable, good faith basis in fact."  Id. at 307.  So it is here, and we hold unhesitatingly that Lee's joinder was appropriate.

**VIII**

Lee's employment history was unusual for a pharmaceutical executive:  her most relevant prior work experience seems to have been as an exotic dancer at a Chicago-area strip club.  Before trial, the government sought leave to introduce evidence about Lee's past work and her unorthodox professional behavior with Dr. Madison (the notorious pill mill operator).  The district court ruled, over Lee's objection, that the proffered evidence was "not admissible to prove the Defendants' character, but such evidence may be admissible for other purposes, including to establish the nature of the relationships between the co-conspirators, duress, or relevant corporate culture."  Along the same lines, the court ruled that Lee's employment history "[was] not admissible to prove [her] character," but "may be intrinsic to aspects of the charged offense" and, to that extent, might be admissible.  In the end, the court temporized, stating that the

proffered evidence "will be admitted if it is otherwise admissible" under the federal rules of evidence.

At trial, the government offered evidence of Lee's employment history. Burlakoff testified that he first met Lee while she was working at a strip club, that he invited her to apply for a sales manager position at Insys, and that he sent her résumé to Babich. In order to bolster its theory that Kapoor knew of Lee's lack of credentials in either management or pharmaceutical sales, the government discussed at sidebar its intention to introduce an email that suggested that Lee had run an escort service. The court refused to admit the email but allowed testimony about whether portions of Lee's résumé were incomplete.

In front of the jury, the prosecutor asked Burlakoff whether someone had provided Insys with information that Lee was "running an escort service." The court sustained an objection and struck the question. But that was not the end of the matter. When the parties returned to sidebar, the district court ruled that the email contained "relevant information," but directed the prosecutor "to keep the salacious aspect to an absolute minimum." Acceding to a defense request for an instruction that the contents of the email were not being admitted for the truth of the matter asserted, the court told the jurors that they would "hear testimony . . . that the company got some information about Ms. Lee that suggested that she might not be qualified for the job." Because

"the letter that [Insys] received is anonymized," the court cautioned:

> The letter does not — and I cannot emphasize this strongly enough — does not come in for the truth of the matter asserted. . . . [T]he person that wrote . . . the letter . . . is certainly not here. They're not testifying. There may be issues of bias. We don't have any way to know if what they're saying is true or not. You're to consider this information only to the effect that [it] had on the company and what they did in response to receiving this information.

Burlakoff then testified that Babich had received an email about Lee from an "ex-fiancé . . . who had a bone to pick with her." According to Burlakoff, the email questioned why Insys would hire someone with Lee's background and listed several websites. He checked the websites and found topless photos of Lee. After he informed Babich, Babich consulted with Kapoor, who "s[aw] no issue with it" but asked that "those pictures come down immediately." Burlakoff relayed Kapoor's wishes to Lee, who took the topless photos down.

Separately, two sales representatives testified that they went to a Chicago nightclub with Lee and Dr. Madison after a speaker event. One testified that Lee "was sitting on [Dr. Madison's] lap, kind of bouncing around, and he had his hand sort of inappropriately all over her on her chest." The other sales representative testified that he observed "[v]ery inappropriate contact" between Lee and Dr. Madison, such as Dr. Madison placing

"[h]is hands . . . all over her, her front and her pants, in her shirt" and "heavily kissing" Lee.

Lee objected to all of this testimony and moved for a mistrial, which the district court denied. She argues that the court erred in admitting this evidence because it constituted "salacious propensity evidence" that should have been excluded under Federal Rule of Evidence 404(b). She suggests that because "the jury heard questions that gave an inference that if Lee worked as an escort or operated an escort service for financial gain in the past and had topless photos on the internet, it is more likely that she committed the charged offense for financial gain." In the alternative, she suggests that the evidence should have been excluded under Rule 403.

We review the district court's admission of the challenged evidence for abuse of discretion. See Iacobucci, 193 F.3d at 20. We start with Lee's Rule 404(b) challenge. Rule 404(b)'s propensity bar "excludes only extrinsic evidence — 'evidence of other crimes, wrongs, or acts' — whose probative value exclusively depends upon a forbidden inference of criminal propensity." United States v. Manning, 79 F.3d 212, 218 (1st Cir. 1996) (quoting United States v. Hadfield, 918 F.2d 987, 994 n.5 (1st Cir. 1990)). Evidence intrinsic to the crime charged is not precluded under Rule 404(b). See id.

Following these guideposts, we conclude that Rule 404(b)'s proscription of propensity evidence is inapposite here. The probative value of the challenged evidence does not depend exclusively on a forbidden inference of propensity but, rather, is intrinsic to the crime charged. Burlakoff's testimony about Lee's qualifications (or lack of them) tends to show that neither Kapoor nor Lee could reasonably think that Lee was hired as a sales manager due to either her executive excellence or her marketing skill set. Instead, the evidence suggests that the defendants' scheme to bribe doctors into prescribing Subsys indiscriminately offered doctors both money (through the speaker programs) and sexual favors.

So, too, the sales representatives' testimony about Lee's physical interactions with Dr. Madison has independent probative value: that testimony confirms Lee's willingness to influence doctors' prescription habits through sexual interactions. As Burlakoff made clear, the doctors "prescribe[d] strictly based on their relationship with the sales manager." Here, the challenged evidence was relevant because it explained the background and development of the relationship between two of the coconspirators (Lee and Dr. Madison) inasmuch as it showed Lee's tactics for getting Dr. Madison "to keep his writing up" and because it revealed some of the unprofessional motivations underlying Dr. Madison's prescription habits. See United States

- 88 -

v. Escobar-de-Jesus, 187 F.3d 148, 169 (1st Cir. 1999). As the district court noted, the evidence is "illustrative of [Lee's] relationship with [Dr. Madison] and how she's interacting with him" to motivate the doctor to prescribe more and more Subsys.

We also reject Lee's contention that the jury necessarily inferred that she was likely to have committed a crime from evidence that she ran an escort service and that topless photos of her floated on the internet. The record contains no indication of the evidence being offered or used for that purpose. Perhaps more importantly, the district court carefully limited the ways in which the jury could put that information to use. The email came in only to show "the effect that [it] had on the company and what [the company] did in response to receiving this information." We long have held that courts may presume that jurors will follow the judge's instructions, United States v. Spencer, 873 F.3d 1, 16 (1st Cir. 2017), and Lee has provided no reason for us to deviate from that norm.

Nor did the district court abuse its discretion in concluding that the probative value of the challenged evidence was not substantially outweighed by its unfairly prejudicial effects. We afford district courts appreciable discretion in striking the balance that Rule 403 demands. See Mehanna, 735 F.3d at 59; Freeman, 865 F.2d at 1340. The evidence challenged here was probative of one of the ways in which Lee and her superiors

attempted to influence prescribers, and it was also probative of the defendants' intent to downplay traditional sales strategies that focus on patients' needs. Here, moreover, the district court was sensitive to the potential for prejudice, cautioning the government to "tone it down" and to avoid the specific details of Lee's encounter with Dr. Madison. In the same spirit, the court made certain that the information derived from the email was presented to the jury as suspect: it told the jurors that there was no way to find out if the information in the email was true and instructed them not to take it for the truth of the matter.[12] We conclude, therefore, that the district court held the Rule 403 balance steady and true, and that Lee's claim of error is impuissant.

Lee's appeal from the denial of her motion for a mistrial is equally unavailing. "Declaring a mistrial is a last resort, only to be implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair." Sepulveda, 15 F.3d at 1184. We review the district court's denial

_____

[12] Lee argues in passing that the "[a]dmission" of the email "would offend" the Confrontation Clause. See U.S. Const. amend. VI. This argument collapses of its own weight: the email was never admitted into evidence and, in any event, the court told the jury that it could not consider the contents of the email for the truth of the matter asserted. Consequently, the right to confrontation was not implicated. See United States v. Cabrera-Rivera, 583 F.3d 26, 33 (1st Cir. 2009).

of a mistrial for abuse of discretion.  See United States v. Chisholm, 940 F.3d 119, 126 (1st Cir. 2019).

In the case at hand, the district court supportably found that a mistrial was not required.  Its clear limiting instructions and prompt striking of extraneous matter, combined with the presumption that juries follow the trial court's instructions, leads inexorably to a conclusion that the district court did not abuse its discretion.

## IX

Lee requested a jury instruction on supervisory condonation.  She asked that the jury be instructed that while "Burlikoff [sic] and Babich's knowledge or condoning of activities does not by itself constitute a defense or an excuse," evidence of their "actions or omissions, or evidence of deficiencies in the manner in which they implemented or enforced [Insys's] policies and procedures, may be considered . . . to the extent that such evidence bears on the issue of whether or not defendant Lee formed the required intent to commit the crimes with which [s]he is charged."  The district court did not give the requested instruction.  Lee preserved her objection and now assigns error.

Our review of the district court's eschewal of this proposed instruction is for abuse of discretion.  See United States v. De La Cruz, 514 F.3d 121, 139 (1st Cir. 2008).  A district court is, of course, under no obligation to honor a party's word choices

or to parrot proposed language when delivering jury instructions. See United States v. DeStefano, 59 F.3d 1, 2-3 (1st Cir. 1995). As a result, we will not second-guess the trial court's rejection of a proposed instruction unless the proposed instruction is itself substantively correct, was not covered (at least in substance) in the charge as given, and touched upon a salient point (such that the refusal so to instruct seriously undercut the proponent's ability to mount a particular claim or defense and caused substantial prejudice). See id.

Lee's proposed instruction fails under the second and third prongs of this formulation. The district court's charge, as rendered, contained a good-faith instruction, which informed the jury that "[t]he 'good faith' of a Defendant is a complete defense to the charge in the indictment because good faith on the part of the Defendant is, simply, inconsistent with both knowingly and willfully agreeing to become a member of the alleged conspiracy and specifically intending that a member of the alleged conspiracy would commit criminal conduct." The court added that "[a]n honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct." So, the court said, "[i]f the evidence in the case leaves . . . a reasonable doubt as to whether a Defendant acted with criminal intent or in good faith," the jury should "find the Defendant not guilty."

This instruction fully permitted Lee to present her supervisory condonation defense and, thus, forestalled any cognizable claim of prejudice. Lee demurs, maintaining that the court's good-faith instruction did not accommodate her two-pronged argument that she "was lawfully following the instructions of her employer" and that "Insys condoned her conduct."

Lee's claim of error depends on an unrealistically cramped reading of the court's good-faith instruction. Under this instruction, Lee was free to argue that she acted in good faith because she subjectively believed that her conduct was lawful and that she based that belief on her employer's orders, its condonation of her conduct, or both. Because of her employer's guidance and approval, she might say, her mistake was an honest one. The court's good-faith instruction focused the jury on Lee's "actual, subjective beliefs," so the "charge basically did what [Lee] wanted it to do." United States v. Denson, 689 F.3d 21, 26 (1st Cir. 2012). Because the instruction actually given accommodated both prongs of Lee's argument, the district court's refusal to use Lee's proposed language was well within its discretion.

## X

Rowan assigns error to the district court's denial of his mid-trial motion to compel the disclosure of allegedly exculpatory information. See Brady v. Maryland, 373 U.S. 83

(1963).  This claim of error harks back to a prosecutor's comment to Rowan's counsel, allegedly made during a break in Gurrieri's testimony, supposedly mentioning that the government had discussed a recording used as an IRC training tool with Gurrieri.  Asserting that this recording was a critical piece of evidence in the government's case against him, Rowan moved to compel the government to produce all communications between Gurrieri and the government concerning the recording.

In response, the government vouchsafed that it "has consistently met and exceeded its ethical and legal discovery obligations in this case."  There were no further communications that were subject to production, the government said, because it had "fully complied with all of its obligations," including disclosure of all of its interview reports and rough notes.  The government added that "[i]f [it] was aware of any exculpatory or Brady information in any form, it would have disclosed that information in a report, in agent notes, verbally, via email, or in some other form."

The district court denied Rowan's motion "[b]ased on the government[']s representations" and its own "understanding of the issues in the case as a result of a lengthy trial."  The court took the opportunity, though, to remind the government "that its [Brady] obligations continue through sentencing."  Rowan moved for reconsideration, but to no avail.

We review the district court's denial of a motion to compel discovery for abuse of discretion.  See United States v. Flete-Garcia, 925 F.3d 17, 33 (1st Cir.), cert. denied, 140 S. Ct. 388 (2019).  This standard of review is not one-dimensional.  See Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020); United States v. Lewis, 517 F.3d 20, 24 (1st Cir. 2008).  Within it, we review for clear error the district court's factual finding that no further document subject to production existed.  See United States v. Padilla-Galarza, 990 F.3d 60, 79-80 (1st Cir. 2021).

Under Brady, the government is obligated "to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment."  United States v. Prochilo, 629 F.3d 264, 268 (1st Cir. 2011) (citing, inter alia, Brady, 373 U.S. at 87).  Where, as here, a claim of Brady error is advanced, the defendant bears the burden of showing "a likelihood of prejudice stemming from the government's nondisclosure."  Flete-Garcia, 925 F.3d at 33.  To make such a showing, he must "articulate with some specificity what evidence he hopes to find in the requested materials, why he thinks the materials contain this evidence, and, finally, why this evidence would be both favorable to him and material."  Id. (quoting Prochilo, 629 F.3d at 269).  And in determining whether the evidence sought is material, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether

- 95 -

in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." United States v. Josleyn, 206 F.3d 144, 152 (1st Cir. 2000) (quoting Strickler v. Greene, 527 U.S. 263 (1999)).

Rowan has utterly failed to make the requisite showing. The most prominent fly in the ointment is that he has failed to establish that the evidence he seeks actually exists. Although Rowan conclusorily asserts that "such communications must have occurred," all three prosecutors (including the prosecutor whom the defense identified as having mentioned the government's purported discussion with Gurrieri) signed the pleading in which the government insisted that it had "withheld nothing." Given the unequivocal nature of the government's representations and the experience gleaned by the court in presiding over this case (including protracted pretrial proceedings, discovery disputes, and a lengthy trial), we decry no clear error in the court's determination that the claimed evidence did not exist. A defendant's naked assertion that a particular communication "must have occurred," no matter how vociferously expressed, is insufficient to undermine a reasoned judicial determination that no such communication actually exists. See United States v. Duval, 496 F.3d 64, 75 (1st Cir. 2007); cf. Padilla-Galarza, 990 F.3d at 80 (holding, in Jencks Act context, that "the government cannot be

expected to produce that which has never existed").  We therefore reject Rowan's claim of Brady error.[13]

**XI**

Following the adverse jury verdicts, Simon — represented by successor counsel — moved for a new trial.  See Fed. R. Crim. P. 33.  Among the grounds asserted in support of this motion, he averred that his trial counsel had been handicapped by a conflict of interest.  Specifically, he averred that his trial counsel, Steven Tyrrell, was conflicted because the law firm in which Tyrrell was a principal — Weil Gotshal & Manges LLP (Weil) — was representing Insys in a bankruptcy restructuring at the same time that Tyrrell was representing Simon in this case.  The district court disagreed and refused to order a new trial.  Simon appeals that ruling.

Simon's conflict-of-interest claim has its roots in an internal investigation that Insys conducted some three years prior

---

[13] We add that Rowan's explanations for why the alleged evidence would be exculpatory and material are unconvincing:  they are woven with nothing more than wispy threads of speculation and surmise.  Mere conjecture that certain communications "might contain exculpatory evidence" without "any supporting evidence or arguments to indicate this was, in fact, the case," is inadequate to ground a claimed Brady violation. United States v. Brandon, 17 F.3d 409, 456 (1st Cir. 1994); see Flete-Garcia, 925 F.3d at 34 (concluding that "district court's refusal to compel production of requested information is not an abuse of discretion" when "theory of materiality is based entirely on conjecture"); Prochilo, 629 F.3d at 269 (explaining that defendant's Brady showing "cannot consist of mere speculation").

to the start of Tyrrell's representation of Simon. In December of 2013, Insys received a subpoena from the Department of Justice. Insys immediately retained Skadden, Arps, Slate, Meagher & Flom LLP (Skadden) to serve as its outside investigations and compliance counsel. Skadden conducted a thorough investigation, interviewed numerous Insys employees, reviewed a wide range of company practices, and offered advice to Insys's board of directors.

Years passed and — in 2017 — Simon retained Tyrrell to represent him in the case at hand. The following year, Insys turned to Weil in connection with anticipated chapter 11 proceedings. When Tyrrell became aware of his firm's potential representation of Insys, he discussed the matter with Simon. Tyrrell informed Simon that — should his representation of Simon continue — he would be "walled off" from the Weil team handling Insys's bankruptcy reorganization. Simon assented to this arrangement.

In due course, Weil signed an engagement letter with Insys, which explicitly permitted Tyrrell to act adversely to Insys in connection with his representation of Simon. Weil quickly instituted screens to prohibit the two teams from reviewing, discussing, or sharing information.

We fast-forward to June of 2019. After the jury returned its verdicts, Simon queried Tyrrell about Weil "representing Insys in its bankruptcy case." Tyrrell reminded Simon of their earlier

conversation, described the "wall" that was in place, and assured Simon that "there is no sharing of information or interaction." Simon renewed his queries the following month, calling Tyrrell's attention specifically to the internal investigation that Skadden had overseen. Tyrrell responded that the internal investigation had ended before the criminal case began and reiterated that Weil's representation of Insys in the bankruptcy proceedings was unrelated to the criminal case.

Unassuaged, Simon retained fresh counsel and moved for a new trial on the ground that Tyrrell had been laboring under a conflict of interest. He alleged that Weil's representation of Insys had inhibited Tyrrell and prevented him from seeking to obtain the findings of Insys's internal investigation into the marketing and sale of Subsys. Although Insys had consistently asserted that those materials were shielded by the attorney-client privilege, Simon argued that a different (conflict-free) attorney could have pierced the privilege. The government opposed the motion. The district court denied relief, concluding that Simon's proffered alternative strategy was not plausible. See Gurry, 427 F. Supp. 3d at 217.

We review the district court's factual findings in connection with the conflict-of-interest claim for clear error but afford de novo review to the court's ultimate conclusion. See Reyes-Vejerano v. United States, 276 F.3d 94, 97 (1st Cir. 2002).

Under the Sixth Amendment, a defendant has a right to conflict-free counsel. See United States v. Ponzo, 853 F.3d 558, 574 (1st Cir. 2017); U.S. Const. amend. VI. That right, though, does not protect a defendant from an attorney's "mere theoretical division of loyalties." Id. at 575 (quoting Mickens v. Taylor, 535 U.S. 162, 171 (2002)). To prevail on a conflict-of-interest claim, a defendant must show that "'a conflict of interest actually affected' the lawyer's 'performance.'" Id. (quoting Mickens, 535 U.S. at 171). Such a showing requires a demonstration "that (1) the lawyer could have pursued a plausible alternative defense strategy or tactic and (2) the alternative strategy or tactic was inherently in conflict with or not undertaken due to the attorney's other interests or loyalties." Id. (quoting United States v. Colón-Torres, 382 F.3d 76, 88 (1st Cir. 2004)).

We conclude — as did the court below, see Gurry, 427 F. Supp. 3d at 217-19 — that no actual conflict of interest existed because piercing attorney-client privilege to lay bare the findings of Skadden's internal investigation was not a plausible defense strategy. According to Simon, this proposed strategy would have offered "material from Skadden's internal investigation to substantiate a good-faith defense." This must be so, he muses, because Skadden "apparently . . . did not advise Insys to shut down the ISP, to close the IRC, or to fire or discipline Mr. Simon." Building on this rickety foundation, Simon argues that

the seeming absence of such advice must mean that Skadden concluded that Insys's operations were beyond reproach. So, Simon's thesis runs, Skadden's internal investigatory materials "would have revealed the evidentiary basis — facts, documents, witness testimony — underlying Skadden's findings and advice, which [his] defense counsel could have marshaled to use at trial."

This proposed strategy is both substantively and strategically bankrupt. First and foremost, Simon's allegation that the findings reached during the investigation must be favorable to him is anchored on abject speculation. Simon consistently has acknowledged that he has never been "privy to the details of [outside counsel's] findings and advice." Skadden's findings are, he confesses, "unknown to [him]." Knowledge is essential to the making of value judgments, and saying that something is "unknown" is tantamount to an admission that its favorability cannot be ascertained.

Despite this void, Simon self-servingly surmises that the materials generated during the investigation must bolster his defense because Skadden interviewed him and — subsequent to that interview and the completion of Skadden's investigation — "nobody ever counseled [him] to modify his own practices or imposed any discipline or punishment on him for wrongdoing." Simon also suggests that since the IRC did not shut down, an inference is warranted that Skadden did not advise Insys to cease operations.

Piling inference upon inference, he then suggests that Skadden must have refrained from giving such advice because it found Insys's business practices aboveboard. In other words, Simon asks us to assume that the materials would be exculpatory simply because the internal investigation neither "resulted in [any] adverse employment action against [him]" nor brought about any changes in day-to-day IRC operations. Arriving at that assumption, though, elevates hope over reason. Given the complicity of so many company hierarchs in the scheme, the unknown time span covered by the internal investigation, and the lack of congruity between that time span and the life of the conspiracy, Insys's failure to either take adverse action against Simon or to modify the IRC's modus operandi may well have other more compelling explanations.

In all events, the district court had ample reason to infer that the findings of the internal investigation were likely detrimental to Simon's defense. The government and the defendants engaged in considerable pretrial skirmishing as to whether the government could elicit testimony from an Insys compliance officer who coordinated the investigation. See id. at 218. Her testimony would have focused on her conclusion that the IRC was engaging in insurance fraud, id. — a conclusion that Simon would just as soon have the jury not hear. So, too, other evidence in the record makes it likely that the evidence Simon seeks would not have been exculpatory. As we already have pointed out, see supra Part

III(C), the record includes substantial evidence of Simon's knowledge of illegitimate Subsys prescriptions and his attempts to increase their volume, his knowledge of the IRC's fraudulent representations to insurers, and the like. Viewing the record in its entirety, Simon's notion that Insys permitted him to continue working because his work was legitimate seems far less plausible than the notion that he was kept in place because his work furthered the ongoing criminal scheme. Cf. Gurry, 427 F. Supp. 3d. at 220 ("The evidence at trial indicated that although Insys hired compliance personnel and a general counsel after receiving the subpoena in December 2013, these individuals were largely viewed as obstacles to the success of the sales force and the company."). Considering the improbability of Simon's assumption, his afterthought defense strategy cannot be said to possess even a patina of plausibility and, thus, cannot be considered a viable strategy. See United States v. Cardona-Vicenty, 842 F.3d 766, 773 (1st Cir. 2016); see also Ponzo, 853 F.3d at 577 ("[M]ere speculation does not suffice to show a Sixth Amendment infraction.")

To complete the picture, we note that the proffered strategy was not only implausible but also entailed significant strategic risks. It is hornbook law that forgoing "a strategy that could inculpate the defendant does not constitute an actual

conflict." Ponzo, 853 F.3d at 576. That is precisely the sort of strategy that Simon now embraces. We explain briefly.

It is luminously clear that piercing the attorney-client privilege would have been fraught with peril. Success in that endeavor would have opened the floodgates for damaging testimony from Insys's compliance officer, in-house counsel, and others involved in the internal investigation. The potentially dire consequences of such a strategy explain why the other defendants — even though most of them would have had at least as good a chance as Simon to benefit from the allegedly exculpatory evidence — chose, through independent and highly skilled counsel, not to buck Insys's attorney-client privilege. Instead, they banded together and asked the district court, in their own words, to "preclude the government from eliciting at trial any testimony regarding privileged communications between Insys or its Board of Directors . . . and the company's in-house or outside counsel." To put it bluntly, they all went to the mat to block the government from introducing the findings of the internal investigation. The fact that no other defendant sought to pierce Insys's attorney-client privilege is a telling indication that this strategy was neither likely to be helpful to the defendants nor free from significant risks of further inculpating them. Cf. Brien v. United States, 695 F.2d 10, 16 (1st Cir. 1982) (giving weight to "the fact that none of [defendant's] other co-defendants, even though they had

independent counsel," sought the particular evidence).  This is far removed from the kind of alternative defense strategy that can undergird a Sixth Amendment claim.  See Ponzo, 853 F.3d at 576.

If more were needed — and we do not think that it is — Simon also has failed to establish a meaningful relationship between the findings of the internal investigation and his proffered good-faith defense.  Such a defense asks the jury to determine what the defendant's "actual, subjective beliefs" may have been.  Denson, 689 F.3d at 26.  Because Simon has never been privy to the findings of the investigation, those findings could not have informed his subjective beliefs.[14]  See United States v. Zayyad, 741 F.3d 452, 461 (4th Cir. 2014); United States v. Dynalectric Co., 859 F.2d 1559, 1574 n.19 (11th Cir. 1988).

_____

[14] At trial, attorney Tyrrell did press a condonation defense on Simon's behalf:  he argued that "when [Simon] started, the actions that he took were in line with the strategies that were mapped out by the company's leaders and communicated to the entire sales force, and there's no evidence that [he] knew or understood that any aspect of those strategies was illegal."  Because this defense substantially covered the defense that Simon now says was impaired and because the findings of the internal investigation remain largely shrouded in mystery, it is apparent to us that Simon has failed to articulate any benefit that his proposed strategy plausibly might have achieved.  Thus, there is no basis to conclude that Tyrrell's choice to refrain from trying to pierce the attorney-client privilege "actually affected the adequacy of [Simon's] representation."  Familia-Consoro v. United States, 160 F.3d 761, 764 (1st Cir. 1998) (quoting Cuyler v. Sullivan, 446 U.S. 335, 349 (1980)); cf. Brien, 695 F.2d at 15 (finding no actual conflict of interest when "the tactics [defendant] suggests that his attorney could have pursued appear to be merely hypothetical choices that in reality could not have benefited [him]").

That ends this aspect of the matter. To prevail on a Sixth Amendment conflict-of-interest claim, "the conflict must be real." Brien, 695 F.2d at 15. The conflict of interest that Simon ascribes to his trial counsel is purely theoretical and, thus, does not come close to supporting a claim of constitutional dimension. See id. We are not in the business of granting "undeserved windfall[s]" to defendants who merely point to any course of action not taken by their attorney and cry foul. Cardona-Vicenty, 842 F.3d at 774 (internal quotation omitted). It is exactly that kind of windfall that Simon is seeking. His quest goes begging because the district court was on solid ground in denying his conflict-of-interest claim.

## XII

Gurry contends that the district court blundered in denying his motion for a new trial. He argues that the evidence against him was "remarkably thin" and that the government's case turned on the "uncorroborated" word of one cooperating witness — Gurrieri.

Where, as here, a new trial motion is based upon the weight of the evidence, a district court should not grant a new trial "unless it is quite clear that the jury has reached a seriously erroneous result." United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986) (quoting Borras v. Sea-Land Serv., Inc., 586 F.2d 881, 887 (1st Cir. 1978)). In a nutshell, such a remedy

should be granted sparingly and only when the evidence preponderates heavily against the jury's verdict or a miscarriage of justice otherwise looms. See United States v. Merlino, 592 F.3d 22, 32 (1st Cir. 2010). We review a district court's denial of such a motion solely for abuse of discretion. See United States v. Ruiz, 105 F.3d 1492, 1501 (1st Cir. 1997).

The record comfortably supports Gurry's convictions on the mail- and wire-fraud predicates. He advised employees to "ride the gray line" with insurers and use the "spiel" to obscure the patients' lack of a cancer diagnosis. In addition, he led strategic planning for the IRC, attended the daily 8:30 a.m. management calls as the IRC's "mouthpiece," listened to accounts of the IRC's deceptive practices during those daily calls, directly supervised Gurrieri (who instructed employees to report false medical rationales for prescriptions and bogus lists of tried-and-failed medications), approved spurious patient-specific reports of difficulty swallowing, and enforced IRC authorization quotas. This evidence supports the jury's conclusion that Gurry deliberately participated in Insys's defrauding of insurers — a scheme that involved bribing doctors (through the mails) to generate prescriptions and misrepresenting (through the wires) patients' medical histories and needs.

In resisting this conclusion, Gurry focuses single-mindedly on Gurrieri's credibility. Without that testimony, he

suggests, the evidence against him would be weakened to a point where the adverse jury verdict would topple.

Gurry's single-minded focus means that he has left himself with a steep uphill climb: "the district court must generally defer to a jury's credibility assessments" when evaluating a motion for a new trial. Merlino, 592 F.3d at 32. On appeal, we may not "second guess the [district] judge's refusal of a new trial and the jury's willingness to accept the essentials of [a government witness's] account of the events." United States v. Pitocchelli, 830 F.2d 401, 403 (1st Cir. 1987) (affirming denial of new trial when trial court elected to leave "to the jury the ultimate decision as to whether it believed" disputed testimony).

Even if we set to one side the steepness of this slope, Gurry has not shown that the jury's verdict was seriously flawed. He offers nothing that is sufficient to discredit the inference that he purposefully bought into the IRC's tactics. We briefly inspect his main contention — that Gurrieri was not to be believed — and explain why we find that contention wanting.

First, Gurry emphasizes Gurrieri's decision to testify as a cooperating witness. He rates this as a reason to disbelieve her testimony. But Gurry's rating system is out of kilter: he fails to take into account the jury's prerogatives. The district court appropriately instructed the jury that Gurrieri was cooperating with the government and that her testimony therefore

ought to be considered "with particular care and caution." Given this cautionary instruction, it was within the jury's province to choose whether to believe or disbelieve Gurrieri's testimony. See United States v. Appolon, 695 F.3d 44, 55 (1st Cir. 2012).

Next, Gurry declares that Gurrieri's testimony was "uncorroborated." This declaration is specious.[15] Other witnesses and documents substantiated the inference that Gurry both knew of and supported the IRC's corrupt tactics. For instance, a sales manager testified that she toured the IRC with Gurry, and that they listened as an employee used deceptive tactics to obtain Subsys authorization from an insurer over the telephone. Then, too, Babich testified that Gurry was part of the "primary group" of senior executives who participated in the daily 8:30 a.m. management calls, that Gurry was in charge of communicating to that group "any highlights both positive and negative that they're seeing in the IRC," that those highlights were informed by Gurry's communications with Gurrieri, and that those daily calls discussed the IRC's deceptive tactics (including the promiscuous use of

---

[15] We do not mean to imply that corroboration was a sine que non to a conviction. It was not. See United States v. Martínez-Medina, 279 F.3d 105, 115 (1st Cir. 2002) (holding that the "uncorroborated testimony of a government informant is . . . enough to convict" because "the law of this circuit . . . leaves in the hands of the jury decisions about credibility of witnesses 'so long as the testimony is not incredible or insubstantial on its face'" (quoting United States v. Andujar, 49 F.3d 16, 21 (1st Cir. 1995))).

"dysphagia" references and the "spiel"). Babich also testified that the dysphagia gambit was discussed by Gurrieri in front of a group that included Gurry.

There was also documentary corroboration. More than one piece of this corroboration originated with Gurry, who (for example) sent himself an email reminder about employee training on the difference between breakthrough cancer pain and breakthrough pain. Similarly, he sent a detailed email to sales managers enumerating strategies that were crafted to prompt unwarranted insurer approvals. Additionally, he was copied on several inculpatory emails, including emails about "the issue that arose with Dr. Chun's pharmacy" and the direct shipments of Subsys to Dr. Ruan's pharmacy for the purpose of ensuring "uninterrupted delivery to patients." Corroboration may come in various forms and shapes, and we find significant corroboration for Gurrieri's testimony in this record.

Gurry presses his attack on Gurrieri's credibility in other ways as well. For instance, he makes a frontal assault on Gurrieri's testimony that he maintained an office near hers at the IRC. In this regard, he notes that two witnesses testified otherwise. That may be so, but it is up to the jury to decide who to believe — and that is especially true when witnesses offer inconsistent versions of the facts. See United States v. Patel, 370 F.3d 108, 112 (1st Cir. 2004). And to tie a bow on it, even

if we assume, for argument's sake, that Gurrieri's recollection was inaccurate on this one point, the jury was still entitled to credit other aspects of her testimony that were unfavorable to Gurry.  Because a witness's testimony is not a monolith, it was within the jury's purview to "credit some parts of [Gurrieri's] testimony and disregard other potentially contradictory portions." United States v. Sabean, 885 F.3d 27, 37 (1st Cir. 2018) (quoting United States v. Alicea, 205 F.3d 480, 483 (1st Cir. 2000)).

Gurry also posits that Gurrieri's testimony that she was following Gurry's directions is contradicted by her "eagerness to take credit for the IRC's success" in the moment.  Gurry's argument rests on a kernel of truth:  Gurrieri did claim credit for the "creat[ion] [of] the IRC."  But nothing about that claim undercuts her testimony that she consulted with Gurry on key decisions, that he sanctioned the IRC's deceptive tactics, and that he directed her to undertake specific acts of fraud (including the submission of authorization requests containing fictious medication lists).

Gurry has one last shot in his sling.  He complains that only Gurrieri characterized him as dishonest.  Other witnesses, he says, described him as disciplined, quiet, polite, respectful, supportive, and stiff.  These traits, he tells us, are inconsistent with the government's attempted depiction of him as a racketeer.

We are not so sanguine.  A quiet, polite, and respectful demeanor is simply not a warranty of good behavior.[16]  Choir boys and curmudgeons alike can commit conspicuously corrupt crimes.  It was the jury's task to weigh the salience, if any, of Gurry's positive traits against the specific evidence of his less-than-savory actions.  Given the deference that we afford juries in regard to credibility calls, we cannot say that the jury in this case either misweighed the evidence or reached a seriously erroneous result.

This door is shut.  The jury was entitled to credit Gurrieri's testimony, and the district court did not err in denying Gurry's motion for a new trial.

**XIII**

The defendants sought a new trial on the ground that prosecutorial misconduct infected the government's closing argument.  The district court denied their motion, and all of them — Gurry directly, and the rest by adoption — now appeal.

We set the stage.  During the rebuttal portion of his closing argument, the prosecutor sought to establish that the defendants specifically intended physicians to prescribe Subsys

---

[16] This verity has been part and parcel of the human experience from time immemorial.  Over four centuries ago, the Bard of Avon famously wrote "To beguile the time, look like the time — bear welcome in your eye, your hand, your tongue.  Look like the innocent flower, but be the serpent under't." William Shakespeare, Macbeth, act 1, sc. 5 (circa 1606).

outside the usual course of professional practice.  He told the jury:

> People intend [the] reasonably foreseeable consequences of their actions.  It is as though, if I took a gun and fired it into the audience, which I'm not going to do, I don't intend to shoot any particular individual, but I know somebody's going to get hit.  And when the defendants arm these doctors with all these bribes and all these incentives, they were creating a loaded gun.

None of the defendants interposed a contemporaneous objection.

In the same phase of his closing argument, the prosecutor referred to evidence that defendants had hired a compliance officer.  He noted that the defendants "had no interest in compliance prior to that" and that the compliance officer "told you, when she was hired in April of 2014, that she was being frustrated in her efforts."  The prosecutor then stated, "regarding Mr. Gurry, who was running the IRC, who is responsible for the IRC, that's his job.  As a corporate officer, he bears the responsibility."  This time, the defendants objected.

The prosecutor also stated:

> After nine weeks of trial, there should be no doubt, in anybody's mind here, that there was a massive insurance fraud here, happened every day, day in and day out.  And there was a massive bribery scheme involved.  I think the defendants concede as much, but what they want to sit here and say to you is that these men and women who ran this company, who were the managers, had no idea what was going on.  Sort of like that scene from Casablanca, I'm

> shocked to find out there's illegal gambling
> in this place.

Along this same line, the prosecutor argued that the defendants "incentivized these doctors" to prescribe Subsys frequently and at high doses, "and they can't sit here and tell you, now, that they didn't intend for that to happen." The defendants did not contemporaneously object to either of these comments.

At the conclusion of the government's rebuttal, the district court gave a curative instruction in response to the objection relating to Gurry's corporate-officer status. It told the jury that "the corporation, Insys, is not on trial here. The individuals are on trial and your verdict must turn on your assessment of the culpability of them as individuals and not as corporate officers." Neither side objected to this instruction.

Several days later — but before jury deliberations began — the defendants sought additional curative instructions or in the alternative, a mistrial. In support, they identified several instances of alleged prosecutorial misconduct:

- They alluded to the comment about Gurry's corporate-officer status and argued that they could not be held criminally liable merely for the wrongdoing of subordinates.

- They calumnized the prosecutor's "loaded gun" analogy and asserted that the statement that

"[p]eople intend [the] reasonably foreseeable consequences of their actions" deviated materially from the specific-intent element of a RICO conspiracy charge.

- Observing that none of them had elected to testify, the defendants raised the specter that the prosecutor's rebuttal argument had "made veiled reference to the fact that Defendants had pressed various factual arguments at trial without taking the witness stand."

The district court responded with an offer to give additional curative instructions. The court then circulated draft instructions; defense counsel proposed revisions; and the court accepted all but one of the proposed revisions.[17] The court read its prepared charge to the jury and followed up by reading the supplemental instructions. In pertinent part, the supplemental instructions admonished:

> At least some of the defendants were at relevant times corporate officers or managers with responsibility for their departments and/or subordinates. The fact that a defendant had an executive or managerial position at Insys is not alone enough to convict the defendant of the RICO conspiracy charge in the indictment.

---

[17] Rowan requested that the court tell the jury that the challenged comment "was not a correct statement of the law." The court declined that request.

A healthcare company executive's or manager's failure to correct or prevent misconduct at the company does not alone constitute a violation of the RICO statute. In other words, even if you think that a defendant should have known about certain conduct, should have done more to correct or prevent such conduct or should be responsible for the conduct of company employees, you cannot convict the defendant on this basis.

As I already told you bribes and kickbacks alone are insufficient to convict in this case. For you to find an agreement regarding the racketeering act of illegal distribution of a controlled substance, honest services mail fraud or honest services wire fraud, you must find that defendants agreed to and specifically intended for healthcare practitioners to write Subsys prescriptions outside of the usual course of professional practice and without legitimate medical purpose. Under the law, knowledge of foreseeable consequences without more is not enough to establish that someone specifically intended certain conduct. Rather, the government must prove that the defendant acted with a bad purpose or with the object of committing a prohibited act, here, for the controlled substance and honest services predicates, having healthcare practitioners prescribe Subsys outside of the usual course of professional practice and without legitimate medical purpose.

. . .

Finally, you should not interpret anything that was said in this case as a comment on the fact that defendants chose not to testify. As I've already instructed you, defendants have an absolute constitutional right not to testify. And you cannot draw any inference from the fact that they exercised their rights. You cannot consider or discuss defendants' choices not to testify during your deliberations.

After giving these supplemental instructions, the district court asked if any party wanted to be heard at sidebar. Receiving no affirmative response, the court instructed the jury to start its deliberations.

Following the adverse jury verdicts, the defendants renewed their prosecutorial misconduct claims in their new-trial motions. Those motions were uniformly denied. See Gurry, 427 F. Supp. 3d at 201.

Although we review the district court's order denying a new trial for abuse of discretion, see Merlino, 592 F.3d at 32 n.5, we evaluate de novo their claims of error involving the propriety of the government's closing argument, see United States v. Kuljko, 1 F.4th 87, 94 (1st Cir. 2021); United States v. Carpenter, 736 F.3d 619, 626 (1st Cir. 2013). We start with the claims of error arising out of the government's comments about Gurry's corporate-officer status and the alleged allusions to the defendants' failure to testify. Those claims of error share a common characteristic: the defendants do not assert that the challenged comments were so toxic that no cautionary instructions could have saved the day but, rather, assert only that the cautionary instructions given by the district court were insufficient.

The architecture of the defendants' assertions shapes the contours of our inquiry. This architecture places waiver principles front and center. We have explained that "when the 'subject matter [is] unmistakably on the table, and the defense's silence is reasonably understood only as signifying agreement that there was nothing objectionable,' the issue is waived on appeal." Soto, 799 F.3d at 96 (quoting United States v. Christi, 682 F.3d 138, 142 (1st Cir. 2012)). One application of this rule occurs when "the district court informed the [parties] exactly how it was planning to instruct the jury" and "sought their feedback," with the result that a party's counsel "affirmatively stated there was no objection" or "remained silent." Soto, 799 F.3d at 96. In that circumstance, an appellate court is free to consider the instructions approved by that party. See id. Any claim that the instructions are inadequate is deemed waived. See id.

With respect to the corporate-officer comment and the alleged references to the defendants' failure to testify, this is such a case. The defendants sought curative instructions addressing specific components of the government's rebuttal argument and the district court obliged by circulating proposed instructions. The court invited edits and — in so far as the proposed instructions pertained to the corporate-officer comment and the comments allegedly touching upon the defendants' failure to testify — accepted all the proposed edits. The court then read

the edited instructions to the jury.  After doing so, the court invited counsel to approach sidebar, yet counsel declined the invitation.  That declination unambiguously signified approval of the supplemental instructions as given and constituted a waiver of the defendants' arguments on those points.  See id.

To be sure, the defendants now argue that waiver principles apply only to "the court's instruction-in-chief, [but] not to curative instructions."  This is so, they say, because only the former "result[s] from an iterative process of give and take between the parties and the court."  Here, however, the transcript shows beyond hope of contradiction that such an iterative process took place with respect to the curative instructions.  In addition, we previously have found that waiver principles apply with undiminished force to claims of error targeting curative instructions.  See, e.g., United States v. Charriez-Rolón, 923 F.3d 45, 53 (1st Cir. 2019).  We hold, therefore, that the defendants' claims of error regarding the corporate-officer comment and the alleged comments on the defendants' failure to testify are unavailing.

This leaves the claim of error relating to the prosecutor's use of the "loaded gun" metaphor.  The government concedes that this metaphor was inconsistent with the specific-intent element of a RICO conspiracy offense and, thus, improper.  Given this concession, we are left to determine whether the

impropriety was harmless.  For that purpose, "[t]he bottom-line question is whether the impropriety 'so poisoned the well that the trial's outcome was likely affected.'"  Kuljko, 1 F.4th at 94 (quoting United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987)).

"In this context, harmless error review takes into account a multiplicity of factors."  Id.  Those factors include "the severity of the impropriety, the nature of the impropriety (that is, whether or not it was deliberate, whether or not it was isolated, and the like), the strength of the government's case against the defendant, and how the district court responded to the impropriety (especially the timing, nature, and force of any curative instructions)."  Id.  The district court, looking at the "loaded gun" metaphor through this prism, concluded that each of the pertinent factors "counsel[ed] against a finding that the Government's misstatement 'so poisoned the well' as to warrant a new trial."  Gurry, 427 F. Supp. 3d at 201.  We agree.

This inquiry is, of course, case-specific. As we already have explained, see supra Parts III(A)-(D), the evidence of the defendants' guilt was copious.  The unseemly metaphor itself played only a bit part in the case:  the prosecutor used it only once in a rebuttal that lasted around thirty minutes and in a trial that lasted for over seven weeks.  Importantly, the prosecutor made no attempt to weave the metaphor into other portions of either his

closing argument or the trial as a whole.  Considering that the "loaded gun" imagery occupies only a few lines in a compendious transcript, the infelicitous comment can fairly be described as "isolated."  United States v. Alcantara, 837 F.3d 102, 110 (1st Cir. 2016).

The defendants disagree.  They argue that the prosecutor's improper metaphor was a deliberate effort to portray them "as indiscriminate drug dealers."  In support, they rely on United States v. Carpenter, 494 F.3d 13 (1st Cir. 2007) — a case in which the defendant was convicted of defrauding investors by misrepresenting his investment strategy, id. at 16.  The prosecutor used "some permutation of the word 'gamble'" in "eighteen instances" during closing argument, as well as "numerous references to other gambling terms" like "cashing in chips," "doubling down," and "river boat gambler."  Id. at 23.  The district court granted the defendant a new trial, concluding that these persistent references reflected a deliberate (and ultimately successful) attempt to inflame the jury, and we affirmed.  See id. at 22.

Except, perhaps, to the extent that it illustrates the wide margins of the district court's discretion with respect to the granting of a new trial based on an out-of-bounds closing argument, Carpenter is not a fair congener.  That case involved a series of improper references and a pattern of abuse.  In contrast,

- 121 -

the prosecutor in this case used the "loaded gun" metaphor once, and the district court supportably found that it was an isolated instance and not a continuing theme. Moreover, the district court in Carpenter found that the prosecutor's misconduct was prejudicial, whereas in this case the district court found that the misconduct, in light of the curative instructions, was harmless. Given these significant discrepancies, comparing this case to Carpenter is like comparing cabbages to cantaloupes.

Here, moreover, the district court's curative instructions were carefully crafted and went to the heart of the matter. The content and timing of those instructions argue persuasively against a finding that the government's misstatement irretrievably poisoned the well. Importantly, the instructions unambiguously debunked the prosecutor's mistaken view of the specific-intent element of the charged offense. The prosecutor had told the jury that people intend the reasonably foreseeable consequences of their actions. To ensure that the jurors did not get the wrong impression, the court told them that this proposition had nothing to do with the case at hand. Furthermore, the court told them in no uncertain terms that "knowledge of foreseeable consequences without more is not enough to establish that someone specifically intended certain conduct." These pointed instructions cleared the air and kept the jurors focused on the real issues in the case.

Grasping at straws, the defendants say that the curative instructions were insufficient because they failed to tell the jury that the prosecutor's argument was improper. But a trial court is not required to use magic words in framing curative instructions: it is only required to convey, in clear language, a message adequate to redress the perceived harm. See United States v. Riccio, 529 F.3d 40, 45 (1st Cir. 2008) ("This court has repeatedly held that a strong, explicit and thorough curative instruction to disregard improper comments by the prosecutor is sufficient to cure any prejudice from prosecutorial misconduct."). The curative instructions given by the court below satisfied this standard, and the court — exercising its discretion — determined that adding a specific indictment of the prosecutor's misstatement was unnecessary. The substantial deference that we afford trial courts in matters of this sort reflects an awareness that the "trial judge . . . listened to the tone of the argument as it was delivered," had an opportunity to "observe[] the apparent reaction of the jurors," and was "more conversant with the factors relevant to the determination." Carpenter, 494 F.3d at 24. We think that the district court's determination that its curative instructions would set the jury straight, without any need to place a scarlet letter on the prosecutor, was within the broad compass of its discretion.

One further observation should be made.  Although the district court's curative instructions are adequate on their face, the record also offers an external validation of their efficacy. As the district court noted, the "loaded gun" metaphor "related primarily" to the intent element of the CSA and honest-services predicates.  Gurry, 427 F. Supp. 3d at 199 n.94.  Thus, Gurry's acquittal on these two predicates lends considerable credence to the conclusion that the district court's curative instructions ensured that any damage done by the prosecutor's improper metaphor did not affect the outcome of the trial.  See Kuljko, 1 F.4th at 95.

We summarize succinctly.  In view of the isolated nature of the gun metaphor, the timely and effective curative instructions given by the district court, the government's independently strong case against the defendants, and the jury's acquittal of Gurry on the CSA and honest-services predicates, we hold that the prosecutor's comment, though unacceptable, was harmless.  See Kuljko, 1 F.4th at 95.

## XIV

The penultimate leg of our odyssey brings us to the defendants' challenges to the district court's restitution orders. They argue that the district court's calculation of the restitution amounts reflected only "a kind of rough justice," unsupported by

the record.  The government defends the district court's calculations.

We paint the backdrop.  In the wake of the jury verdicts, the government sought $306,000,000 in restitution.  This figure reflected the value of all Subsys prescriptions written during the racketeering period (2012-2015).  The defendants objected, challenging the government's method of computation and asserting that the government's suggested price tag was exorbitant.  The district court found a middle ground, ordering restitution in lesser amounts.  See United States v. Babich, No. 16-CR-10343, 2020 WL 759380, at *6 (D. Mass. Feb. 14, 2020); see also supra note 3 (listing inter alia per-defendant restitution amounts).

En route the court made five specific rulings.  First, the court awarded restitution to six patient victims.  See Babich, 2020 WL 759380, at *3-4.  Second, the court declined the government's invitation to base restitution on the totality of Subsys prescriptions written during the life of the conspiracy. See id. at *6.  Even so, the court acknowledged that sifting the legitimate prescriptions from the fraudulent ones would "be too complicated and unduly prolong and burden the sentencing process." Id.  With that in mind, the court made its third ruling, limiting restitution to losses traceable to prescriptions written solely by thirteen bribed coconspirator doctors identified by the government.  See id.

Fourth, the court awarded as restitution 100 percent of the insurers' paid claims for Subsys prescriptions written by those thirteen coconspirator-prescribers. See id. In making these awards, the court refused to apply two reductions urged by the defendants. See id. One requested reduction was "to account for only those claims that passed through the IRC." Id. The other was "to account for only those prescriptions made for non-cancer patients." Id. Figures reported by the government for these two categories, the defendants argued, should be deemed a cap for permissible restitution.[18] The district court rejected this two-pronged argument, stating that "[a]lthough the Court finds the amount of restitution owed beyond the thirteen co-conspirator doctors to be too complicated to calculate, it is clear that the amount that would be owed is at least equal to the total value of prescriptions written by the bribed doctors." Id.

Fifth, the court apportioned restitution. It held Kapoor fully responsible for the total amount of restitution owed — $59,755,362.45 — and capped the restitution obligations of the

---

[18] According to a government expert, "approximately 80.9% of all Subsys prescriptions" were processed by the IRC. And according to a second government expert, prescriptions written for non-cancer patients accounted for approximately 73 percent of Subsys prescriptions written by the thirteen coconspirator-prescribers.

other defendants at lesser levels.[19]  See Babich, 2020 WL 1235536, at *10.

The central restitution-related issue on appeal revolves around the district court's decision to award insurers 100 percent of paid claims for Subsys prescriptions written by the thirteen coconspirator-prescribers.  "We review restitution orders for abuse of discretion, examining the court's subsidiary factual findings for clear error and its answers to abstract legal questions de novo." United States v. Chiaradio, 684 F.3d 265, 283 (1st Cir. 2012); see Padilla-Galarza, 990 F.3d at 92.

A defendant convicted of certain federal crimes (including, as relevant here, crimes "committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), "must make restitution to victims commensurate with the victims' actual losses," United States v. Naphaeng, 906 F.3d 173, 179 (1st Cir. 2018). "[R]estitution is designed to compensate the victim, not to punish the offender." Id.  In awarding restitution, the court's goal is "to make the victim whole again." United States v. Innarelli, 524 F.3d 286, 293 (1st Cir. 2008).  Thus, a restitution order should

---

[19] Of course, liability for restitution under federal law may be joint and several and may be apportioned by the court among the responsible parties.  See 18 U.S.C. § 3664(h).  In this instance, the court apportioned that liability among the defendants who went to trial and those that pleaded guilty before trial (Burlakoff and Babich).

"not confer a windfall upon [the] victim." Naphaeng, 906 F.3d at 179.

For the purpose of calculating restitution, actual loss is the beacon by which federal courts must steer. See id. In this context, actual loss is "limited to [the] pecuniary harm that would not have occurred but for the defendant's criminal activity." Id. (quoting United States v. Alphas, 785 F.3d 775, 786 (1st Cir. 2015)). This standard obligates the government to show both that the particular loss would not have occurred but for the conduct undergirding the offense of conviction and that a causal nexus exists between the loss and the conduct — a nexus that is neither too remote factually nor too remote temporally. See United States v. Cutter, 313 F.3d 1, 7 (1st Cir. 2002).

Restitution is serious business, but hearings to quantify restitution amounts should not be allowed to spawn mini-trials. As we previously have explained, we do not expect a sentencing court to "undertake a full-blown trial" in order to arrive at an appropriate restitution amount. Naphaeng, 906 F.3d at 179. Nor do we hold a sentencing court to a standard of "absolute precision" when fashioning restitution orders. Id. (quoting United States v. Mahone, 453 F.3d 68, 74 (1st Cir. 2006)); see United States v. Sánchez-Maldonado, 737 F.3d 826, 828 (1st Cir. 2013). In the end, we will uphold a sentencing court's restitution award "[a]s long as the court's order reasonably

responds to some reliable evidence." Sánchez-Maldonado, 737 F.3d at 828; see Naphaeng, 906 F.3d at 179 ("[A] restitution award requires only 'a modicum of reliable evidence.'" (quoting United States v. Vaknin, 112 F.3d 579, 587 (1st Cir. 1997))).

Although this standard is "relatively modest in application," Padilla-Galarza, 990 F.3d 60 at 92, it has some teeth. A sentencing court's "[m]ere guesswork will not suffice." Naphaeng, 906 F.3d at 179; see Vaknin, 112 F.3d at 587. Similarly, "rough approximation[s]" that do not "sufficiently reflect[] . . . the losses" of the victims are not appropriate grist for the restitution mill. Innarelli, 524 F.3d at 294. The court must resolve any genuine and material disputes about "the fact, cause, or amount of the loss" by a preponderance of the evidence. Vaknin, 112 F.3d at 582-83; see 18 U.S.C. § 3664(d).

Given this framework, we conclude that the district court's determination to award as restitution 100 percent of Subsys claims linked to the thirteen coconspirator-prescribers is insupportable. To be specific, the court's determination that all of the claims traceable to the thirteen coconspirator-prescribers constituted actual losses caused by the defendants' fraudulent conduct was not borne out by the preponderance of the evidence. For one thing, no party offered evidence that supported the 100-percent figure. In fact, a government expert opined, without contradiction, that "approximately 80.9% percent of all Subsys

prescriptions passed through the IRC." 80.9 percent is not 100 percent, and the government represented to the court that the expert's figure was "a fair and consistent, reasonable approach for the court to use." According this figure due weight, it is evident that the government did not establish but-for causation for all of the claims traceable to the thirteen coconspirator-prescribers. Indeed, the government's steadfast reliance on the expert's calculations is functionally equivalent to an admission that not every Subsys prescription written by these doctors received prior authorization as a result of IRC fraud.

For another thing, the district court appears to have taken a shortcut to compensate for the difficulty of calculating restitution with respect to Subsys prescriptions written by unbribed physicians. See Babich, 2020 WL 759380, at *6. In justifying its finding of actual loss generated through coconspirator-prescribers, the district court pointedly referred to the incalculable losses caused by non-bribed doctors. See id. This reference, though, was out of step with the court's earlier determination that restitution would take account only of the losses caused by the coconspirator-prescribers. See id. To this extent, then, the court's award was internally inconsistent: on the one hand, the court appears to have found that the losses generated by non-bribed doctors were incalculable but, on the other

hand, to have found that those losses nonetheless justified more munificent restitution awards.

These infirmities doom the restitution orders. Every loss that factors into the restitutionary amount must "have an adequate causal link to the defendant[s'] criminal conduct." Alphas, 785 F.3d at 786. The blending of two distinct sets of losses, one of which was incalculable, fails to satisfy the causality requirement. Consequently, the challenged restitution orders must be vacated. On remand, the district court should recalculate the amounts of restitution consistent with its earlier determination that restitution should be limited to prescriptions written by the coconspirator-prescribers. What remains is for the court to "tak[e] into account the extent (if at all) to which the [coconspirator-prescribers'] claims encompassed legitimate losses" not processed through the IRC, id., and to refashion the restitution orders accordingly. Although the court's "reasoning and the calculations leading to the amounts ordered" must be clear, Innarelli, 524 F.3d at 295, its bottom-line determination need only amount to a reasonable response to reliable evidence in the record, see Sánchez-Maldonado, 737 F.3d at 828.

## XV

The finish line is in sight. The district court ordered monetary forfeitures in varying amounts, see supra note 3, and the affected parties (including the government) ask us to resolve

dueling claims of error pertaining to these forfeiture orders.  In evaluating forfeiture orders, we assay the court's legal conclusions de novo and examine its factual findings for clear error.  See United States v. George, 886 F.3d 31, 39 (1st Cir. 2018).

The baseline rule is uncontroversial.  A defendant who has been convicted of RICO conspiracy is liable to forfeit "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity."  18 U.S.C. § 1963(a)(3).  Following the defendants' convictions, the government sought forfeitures equaling the gross proceeds obtained by Lee, Simon, Gurry, and Rowan, respectively, during the racketeering period.  Ruling that "any proceeds obtained from Insys during the time of the conspiracy are forfeitable," the district court obliged.  Babich, 2020 WL 1235536, at *5.  The court went on to hold that "the Defendants' salaries and exercised stock options constitute 'proceeds' that were obtained 'directly or indirectly' from the RICO conspiracy."[20]  Id.  As an offset, though, the court held that the income taxes that each defendant had paid were not "proceeds" under section 1963(a)(3) because those amounts never "ended up in the Defendants' pockets for them to spend in

_____

[20]  Insofar as the forfeiture orders are based upon the monetization of exercised stock options, neither side has challenged the district court's calculations.

- 132 -

the way in which they wanted."  Id. at *7 (alterations omitted).

Accordingly, the court — in shaping its forfeiture orders as to Lee, Simon, Gurry, and Rowan — deducted from their respective gross incomes "the amount of the tax withheld" during the racketeering period.  Id.

Gurry lands the first blow.  He contends that the district court erred as a matter of law because "it declined to determine what portion of [his] income was tainted by racketeering activity."  The government counterpunches.  In a cross-appeal, it contends that the tax offsets were erroneous as a matter of law.[21] We deal with each contention in turn.

**A**

A defendant's proceeds from racketeering activity are "subject to a rule of proportionality."  Cadden, 965 F.3d at 37 (quoting United States v. Angiulo, 897 F.2d 1169, 1211 (1st Cir. 1990)).  This guardrail ensures that proceeds are subject to forfeiture only to "the extent they are tainted by the racketeering activity."  Id. (quoting Angiulo, 897 F.2d at 1212).  It follows that a district court's forfeiture order must determine "the portion of [the defendant's] earnings . . . over the relevant time

_____

[21] Due to his unique compensation package, Kapoor neither sought nor received a tax offset.  See Babich, 2020 WL 1235536, at *6 n.6.  As a result, the government's cross-appeal does not implicate his forfeiture order.

period that were tainted by the racketeering activity and therefore subject to forfeiture."  Id. at 38.

Gurry advances three arguments as to why certain portions of his work at Insys cannot be linked to the racketeering activity and as to why, as a result, the forfeiture of his entire salary was in error.  Lee, Simon, and Rowan adopt these arguments.

Gurry first notes that although he was an Insys employee until 2016, his work at the IRC ended in May of 2014.  Because "[t]here is no evidence that his job responsibilities after May 2014 included any racketeering activity," he posits, any subsequent proceeds are not subject to forfeiture.  This is too crabbed a view of the facts:  Gurry's relinquishment of the responsibility for supervising the IRC did not end his furtherance of, participation in, and profiting from the racketeering scheme.  By 2014, Gurry had negotiated with insurance companies to add Subsys to their compendia of approved drugs.  Those efforts helped the IRC to continue its fraudulent scheme and garner additional revenue for Insys even after Gurry's responsibilities changed.  To the extent that Gurry's racketeering activities on behalf of the IRC generated profits for him after his departure from the IRC, that revenue constitutes proceeds "obtained from the racketeering activity . . . that formed the basis of [his] convictions."  Id. at 37.  Those proceeds were, therefore, forfeitable.  See id.  And in any event, "[m]ere cessation of activity in furtherance of the

- 134 -

conspiracy does not constitute withdrawal" from the conspiracy. United States v. Leoner-Aguirre, 939 F.3d 310, 319 (1st Cir. 2019) (quoting United States v. Ciresi, 697 F.3d 19, 27 (1st Cir. 2012)).

Next, Gurry maintains that his work for the IRC comprised only 20 percent of his job responsibilities. But he cites no authority to support a reduction in his forfeiture amount based on the percentage of his time devoted to the scheme. It would be perverse to provide an incentive for racketeering efficiency, and we do not think that a racketeer can limit his forfeiture liability by the simple expedient of devoting some of his time to legitimate work. Forfeiture calculations depend on the proceeds gained directly or indirectly from racketeering activity, see 18 U.S.C. § 1963(a)(3), not on the percentage of a defendant's time devoted to the conspiracy.[22]

Gurry also contends that his forfeiture order should reflect only the percentage of fraudulent Subsys sales during the racketeering period, not all Subsys sales during that period. The government confesses error and agrees that a remand on this ground is appropriate. That confession is premised upon our opinion in

---

[22] At any rate, Gurry has not established whether the 80 percent of his work allegedly unrelated to the racketeering activity generated earnings for him that were independent of fraudulent Subsys sales. What counts is that the record supports the conclusion that Gurry knowingly joined and furthered the insurance-fraud scheme and that his earnings during that time for the "non-IRC work" flowed at least indirectly from his IRC efforts.

Cadden, 965 F.3d at 37-38, which was decided while these appeals were pending. There, we vacated a forfeiture order because "the government failed to prove that all [drug] sales over the period in question were generated by fraud." Id. Profits from non-fraudulent sales, we said, are not proceeds obtained (directly or indirectly) from the racketeering activity. See id. at 37-38. We ordered the district court, on remand, "to assess . . . the portion of [the defendant's] earnings . . . that were tainted by racketeering activity." Id. at 38.

The same instruction is warranted here. As a matter of law, any Subsys prescription processed independently of the IRC falls outside the scope of the fraudulent scheme. And since the IRC did not seek prior authorization for every Subsys prescription, the district court must determine the percentage of Subsys prior authorizations that were successful through the IRC's efforts. Forfeiture of the whole of Gurry's earnings was, therefore, in error. The forfeiture orders pertaining to Lee, Simon, and Rowan suffer from the same defect, and those orders also must be revisited.

Gurry is barking up the wrong tree, however, when he tries to convince us that "the IRC did not lie about every prescription it processed." The defendants agreed below that 73 percent of the IRC's authorizations involved prescriptions for non-cancer patients and the district court found that the IRC

"misled insurers in a number of ways," even when the patients had cancer. Babich, 2020 WL 1235536, at *6. The IRC's deceptions included dissembling about patients experiencing breakthrough cancer pain, having a history of cancer, having tried-and-failed other medications, and having difficulty swallowing. See id. These tactics were systematically employed by the IRC and did not become honest or accurate by virtue of a patient having cancer. See id. Mendacity was a hallmark of the IRC's operations — a hallmark that permeated its prior authorization efforts.

We agree with the district court that "the fact that a prescription was requested for a cancer patient is insufficient to establish that it was not fraudulent." Id. Based on the overwhelming evidence that these sleazy tactics were business as usual at the IRC, we find that the district court's determination that each prescription processed by the IRC during the racketeering period was tainted by fraud is grounded upon reasonable inferences drawn from adequately established facts. The district court's determination was not clearly erroneous.

**B**

We turn next to the government's cross-appeal. We conclude that the district court's decision to offset the defendants' forfeiture obligations based on the income taxes they paid on those earnings constituted error. Two recent cases inform this conclusion.

In Cadden, the defendant argued that "the District Court erred in calculating the forfeiture amount without deducting the amount in taxes that he paid on those proceeds." 965 F.3d at 38. We disagreed, holding that "the word 'proceeds' in the forfeiture statute refers to gross proceeds, not net profits." Id. (quoting United States v. Hurley, 63 F.3d 1, 21 (1st Cir. 1995)). Because the defendant "clearly 'obtained' the amount of funds subject to forfeiture before they were subject to taxation," that amount was "subject to forfeiture, even though the amount he obtained was itself taxable." Id.

Our decision in United States v. Chin, 965 F.3d 41 (1st Cir. 2020), is to like effect. There, we concluded that "the fact that the offender is required to pay a certain portion of his salary to the federal government as taxes does not affect the fact that he 'obtained' that portion," id. at 57. Taken together, Cadden and Chin resolve the issue. The defendants in this case were taxed on the proceeds subject to forfeiture precisely because they had "obtained" those proceeds.

## C

Consistent with these rulings, we vacate the district court's forfeiture orders as to Lee, Simon, Gurry, and Rowan. The district court must assess what percentage of Subsys prior authorizations were successful independently of the IRC, and reduce the forfeiture amounts of each defendant by that percentage.

See Cadden, 965 F.3d at 38.  It should not, however, apply any tax offset.  We remand for the purpose of recalculating these forfeiture amounts.

**XVI**

We need go no further.[23]  Insys and Kapoor deserve great credit for developing Subsys — a medication which, appropriately dispensed, would have been an important weapon in society's continuing battle to alleviate breakthrough cancer pain.  But Subsys was not appropriately dispensed.  Instead, the defendants — driven by unalloyed greed — marketed the medication through a pattern of racketeering activity and conspired to ensure that it would be dispensed outside the usual course of medical practice and without a legitimate medical purpose.  "Pill mills for us meant dollar signs" and — from the defendants' coign of vantage — Subsys prescriptions, like snake oil on the frontier, became above all else a means of generating revenue.  In taking this cynical approach, the defendants turned what should have been a blessing into a curse.

The jury, after a protracted trial presided over with great care and circumspection by a no-nonsense judge, heard

---

[23] To the extent, if at all, that particular defendants have alluded to other potential claims of error in their extensive briefing, those claims are either insufficiently developed or patently meritless.  Thus, we reject them without further elaboration.

detailed evidence with respect to the defendants' pernicious practices regarding the marketing of Subsys. The jury found the evidence sufficient to hold the defendants guilty beyond a reasonable doubt on virtually all of the charges lodged in the indictment. The jury's findings and verdicts are, we think, fully supportable, and the defendants' multifaceted challenges to them, though skillfully presented, are without force. We conclude, therefore, that the findings and verdicts must stand.

We reach a different result with respect to certain monetary awards made by the district court ancillary to sentencing. Although the defendants do not challenge their sentences as such (and those sentences must remain intact), the restitution and forfeiture orders are attacked (some by the defendants, some by the government, and some by both). We find that the challenged amounts were not properly calculated in certain respects. Thus, certain restitution and forfeiture orders, identified above, must be vacated, and the case must be remanded for further proceedings consistent with this opinion.

To summarize, we set aside the district court's vacation of certain of the jury's special findings regarding the guilt of Kapoor, Lee, Simon, and Rowan vis-à-vis the CSA and honest-services predicates and order reinstatement of those findings. We affirm the jury's special findings and verdicts as to all defendants. We also affirm the district court's denial of the defendants' sundry

motions for judgments of acquittal and/or new trials. So, too, we affirm the district court's orders with respect to challenged pretrial and mid-trial rulings. Finally, we affirm the defendants' sentences,[24] but vacate the district court's restitution and forfeiture orders (except for the forfeiture order regarding Kapoor) and remand for recalculation of the appropriate restitution and forfeiture amounts.

**Affirmed in part, reversed in part, vacated in part, and remanded**.

---

[24] The government has not requested that, upon reinstatement of the special findings concerning the CSA and honest-services predicate, see supra Part III, we remand for resentencing of the four affected defendants (Kapoor, Lee, Simon, and Rowan). In the absence of such a request, we see no need to do so.